# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Carr v. Koch*, 2012 IL 113414

---

| | |
|---|---|
| Caption in Supreme Court: | PAUL CARR *et al.*, Appellants, v. CHRISTOPHER KOCH, State Superintendent of Education, *et al.*, Appellees. |
| Docket No. | 113414 |
| Filed | November 29, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A declaratory judgment action complaining that property tax rates were higher in some school districts than in others and alleging a denial of equal protection in the statutory school funding system implemented by defendant state officials was properly dismissed for lack of standing where the school districts themselves had discretion in setting tax rates. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Sangamon County, the Hon. Patrick Londrigan, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |

| Counsel on Appeal | Scott R. Lassar, Tacy F. Flint, Jason M. Adler and Sean A. Siekkinen, of Sidley Austin LLP, and Alexander Polikoff, all of Chicago, for appellants. |
| | |
| | Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Paul Berks, Assistant Attorney General, of Chicago, of counsel), for appellees. |
| | |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion. Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiffs Paul Carr and Ron Newell brought a declaratory judgment action seeking a declaration that the Illinois education funding system set forth in section 18-8.05 of the School Code (105 ILCS 5/18-8.05 (West 2010)) (hereinafter the education funding statute) violates the equal protection clause of the Illinois constitution (Ill. Const. 1970, art. I, § 2). Named as defendants were Dr. Christopher Koch, State Superintendent of Education; the Illinois State Board of Education (ISBE); and Patrick J. Quinn, Governor of the State of Illinois.

¶ 2    Plaintiffs alleged that as Superintendent, Dr. Koch was the chief education officer for the Illinois State Board of Education. Plaintiffs alleged that the ISBE is the state agency that sets educational policies, standards, and guidelines for Illinois public schools, and oversees and disburses state monies used to fund public education in Illinois. Finally, plaintiffs alleged that as Governor of the State of Illinois, defendant Quinn is charged with executing the laws of the state and is responsible for developing and allocating the annual budget for the state, including the monies to fund public education in Illinois. In addition, the Governor, with the consent of the state Senate, appoints the members of the ISBE. Defendants Koch and Quinn were sued in their official capacities.

¶ 3    Defendants filed a motion to dismiss in the circuit court of Sangamon County. The motion to dismiss was granted, and plaintiffs' complaint was dismissed with prejudice. The appellate court affirmed. 2011 IL App (4th) 110117. This court allowed plaintiffs' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We now affirm the judgment of the appellate court.

¶ 4                     BACKGROUND

¶ 5    As noted, plaintiffs challenge the funding provisions of the School Code. The state's

education funding system is "designed to assure that, through a combination of State financial aid and required local resources, the financial support provided each pupil in Average Daily Attendance equals or exceeds a prescribed per pupil Foundation Level." 105 ILCS 5/18-8.05(A)(1) (West 2010).

¶ 6　For the 2009-10 school year, at issue in plaintiffs' complaint, the statute provided that the Foundation Level of support was $6,119 per pupil. 105 ILCS 5/18-8.05(B)(3) (West 2010). The statute uses an "Average Daily Attendance" figure, as well as "Available Local Resources," in calculating general state aid to schools. See 105 ILCS 5/18-8.05(C), (D) (West 2010).

¶ 7　If a school district's Available Local Resources per pupil is less than the product of 0.93 times the "Foundation Level," general state aid for that district is calculated as an amount equal to the Foundation Level, minus Available Local Resources, multiplied by the Average Daily Attendance of the school district. 105 ILCS 5/18-8.05(E)(2) (West 2010). These districts will be referred to as Foundation Level Districts.

¶ 8　If a school district's Available Local Resources per pupil is equal to or greater than the product of 0.93 times the Foundation Level, and less than the product of 1.75 times the Foundation Level, the general state aid per pupil is derived using a linear algorithm, ranging from 0.07 times the Foundation Level to 0.05 times the Foundation Level. 105 ILCS 5/18-8.05(E)(3) (West 2010). These districts will be referred to as Alternative Formula Districts.

¶ 9　Finally, if a school district for which Available Local Resources per pupil equals or exceeds the product of 1.75 times the Foundation Level, the general state aid for the school district is $218 per pupil. 105 ILCS 5/18-8.05(E)(4) (West 2010). These districts will be referred to as Flat Grant Districts.

¶ 10　Plaintiffs filed their complaint on March 24, 2010. The complaint alleged that the state's education funding system had the effect of requiring taxpayers in school districts with low property values to pay property taxes to fund local public schools at a higher rate than similarly situated taxpayers in school districts with high property values. Plaintiff Carr alleged that he owns property in Homewood-Flossmoor Consolidated High School District 233, a Foundation Level High School District in Cook County. Carr paid annual school property taxes on that property in 2006 at a rate of 4.10%, in order to generate instructional expenditures per pupil of $7,292 in the 2007-08 school year.

¶ 11　Plaintiffs' complaint alleged that in contrast to Carr, a similarly situated property owner in New Trier High School District 203, a Flat Grant District, was taxed at a rate of 1.66%, a rate almost two and a half times less than Carr's tax rate. Nonetheless, the students at New Trier High School received $10,641 per pupil in instructional expenditures, $3,349 more per pupil than the students at Homewood-Flossmoor High School. In addition, New Trier High School received a $218 per student grant from the state.

¶ 12　Plaintiff Newell alleged that he owns property in Cairo Unified School District 1, a Foundation Level Unified School District. Newell paid annual school property taxes on that property in 2006 at a rate of 6.95%, in order to generate instructional expenditures of $6,192 per student in the 2007-08 school year. In contrast, a similarly situated property owner in Scales Mound CUSD 211, a Flat Grant Unified District located in Jo Daviess County, was

taxed at a rate of 3.33%, less than half that paid by plaintiff Newell in 2006. Nonetheless, the students at Scales Mound received over $2,400 more per pupil in instructional expenditures than the students in Cairo USD 1.

¶ 13     Plaintiffs alleged that in order for a Foundation Level District to achieve Foundation Level funding for its students, it is required to tax its citizens at a statutorily specified rate. If a Foundation Level District taxes at any lower rate, then its local property tax revenues, when combined with general state aid, will be insufficient to reach the Foundation Level. In contrast, a Flat Grant District need not tax itself at the statutorily specified rate in order to achieve Foundation Level funding. Moreover, the state provides a Flat Grant District with an additional $218 per pupil regardless of the tax imposed by the Flat Grant District, and regardless of whether the revenue generated by the tax imposed in that district exceeds the Foundation Level. Plaintiffs alleged that the result of the state's education funding system is to require payment of substantially higher tax rates by residents of property-poor Foundation Level Districts than by residents of property-rich Flat Grant Districts, in order to reach the Foundation Level.

¶ 14     Plaintiffs further alleged that, according to the latest available educational funding data, taxpayers in property-poor K-8 school districts paid a median property tax rate that was 23% higher than that paid by similarly situated taxpayers in property-rich K-8 districts. However, students in those property-poor districts received a median operating expenditure per pupil that was 28% lower than that received by students in property-rich school districts.

¶ 15     Likewise, taxpayers in property-poor high school districts paid a median tax rate that was 36% higher than that paid by similarly situated taxpayers in property-rich high school districts, even though the median operating expenditure per pupil in the property-poor high school districts was 36% lower than that paid by taxpayers in property-rich high school districts.

¶ 16     Similarly, taxpayers in property-poor unified districts paid a median property tax rate that was 3% higher than that paid by taxpayers in property-rich unified districts, even though the medial operating expenditure per pupil in the property-poor districts was 14% lower than that received by students in the property-rich unified districts.

¶ 17     Plaintiffs alleged that the state's education funding system serves no rational purpose. Plaintiffs acknowledged that the decision in *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1 (1996), held that disparity in funding between school districts was related to the legitimate state goal of promoting local control of education. Plaintiffs alleged, however, that since the *Edgar* decision, individual schools and school districts in Illinois no longer exercise local control over the core education functions of schools, having abandoned local control of schools in favor of centralized decisionmaking by defendant ISBE. Plaintiffs claimed that the state's reliance on an education funding system that imposes substantially greater burdens on taxpayers who reside in property-poor districts than it does on similarly situated taxpayers who reside in property-rich districts violates the equal protection clause of the Illinois constitution.

¶ 18     In support of their allegations that schools and school districts in Illinois have abandoned control of schools in favor of centralized decisionmaking by the ISBE, plaintiffs pointed to

the Illinois Learning Standards (ILS) promulgated by the ISBE in 1997. The ILS specify what students in all Illinois public schools should know and be able to do in seven core areas as a result of their elementary and secondary schooling. The state measures school performance in Illinois based on the results of mandatory standardized tests. Elementary school students take the Illinois Standard Achievement Test (ISAT), and high school students take the Prairie State Achievement Exam (PSAE).

¶ 19 Plaintiffs alleged that schools face serious penalties for failing to meet state prescribed student performance targets on the ISAT and PSAE, including limiting a school's or district's control over its budget and spending, requiring the use of state-designed tutoring programs, and even assuming control over and imposing forced restructuring on the school or district where a school fails to meet targets for several years. Plaintiffs claimed that the highly detailed ILS, the mandatory tests aligned to the ILS, the specifications of what students must learn in each subject area, plus the severe penalties imposed for failure to comply, established that individual schools and school districts in Illinois no longer exercised local control over the core education function of schools, so that plaintiffs' complaint was not barred by the decision in *Edgar*.

¶ 20 In May 2010, defendants filed a combined motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure. In support of their argument under section 2-619, defendants argued that plaintiffs lacked standing to challenge the education funding statute, and also argued that the Board must be dismissed from the lawsuit for lack of subject matter jurisdiction based on sovereign immunity.

¶ 21 In support of their argument under section 2-615, defendants argued that the complaint must be dismissed for failure to state a claim under the equal protection clause based upon the decision in *Edgar*. Defendants also argued that the ILS did not eliminate local control of schools or the ability to tax property at different rates, and that the funding of public education is a matter for the legislature, not the courts, to address.

¶ 22 The trial court granted defendants' motion to dismiss. The trial court found that *Edgar* controlled, so that plaintiffs could not state a claim for violation of equal protection. The trial court also found that plaintiffs lacked standing to bring their action because the variations in tax-assessment rates were the result of local decisionmaking and could not be firmly traceable to defendants. Finally, the trial court found that the action against the Board was barred by the State Lawsuit Immunity Act (745 ILCS 5/0.01 *et seq.* (West 2010)).

¶ 23 As noted, the Appellate Court, Fourth District, affirmed. 2011 IL App (4th) 110117. The appellate court noted that section 18-8.05(A)(4) states that " '[s]chool districts are not required to exert a minimum Operating Tax Rate in order to qualify for assistance under this Section.' " *Id.* ¶ 29. The appellate court found that the allegations in plaintiffs' complaint confirmed that the tax rates imposed were not obligated by the education funding statute, as the rates imposed by plaintiffs' respective school districts, 4.10% and 6.95%, were more than double the rates the state used to calculate its contributions to those districts. *Id.* ¶ 30. Plaintiffs' school districts were neither punished nor rewarded for exceeding the statutory tax rates on which the state based its aid calculation, and the state did nothing to induce plaintiffs' school districts to tax at rates of 4.10% and 6.95%. *Id.* Therefore, the appellate

court concluded that any injury incurred by higher tax rates was not fairly traceable to defendants' actions, and a declaration that the state's education funding statute is unconstitutional would not redress plaintiffs' claimed injury of higher tax rates. *Id.* In fact, a declaration that the state's education funding statute is unconstitutional likely would result in higher property tax rates to compensate for the loss of state aid. *Id.*

¶ 24    The appellate court also held that plaintiffs' claim that the state has abandoned local control of schools in favor of centralized decisionmaking by the Board was insufficient to confer standing. *Id.* ¶ 31. The appellate court observed that plaintiffs did not allege that students in their school districts had failed to meet the state's performance standards, nor did plaintiffs allege that the state had imposed or threatened to impose any of the remedies available to save failing school districts. *Id.* ¶ 32. In any event, even if plaintiffs had made such allegations, it is not the funding formula that authorizes the state to threaten such penalties, but rather sections 2-3.25d and 2-3.25f of the School Code (105 ILCS 5/2-3.25d, 2-3.25f (West 2010)), which plaintiffs did not challenge. 2011 IL App (4th) 110117, ¶ 32. Therefore, plaintiffs' claim that the combined effect of the state's funding scheme and the ILS caused them to be treated differently from similarly situated taxpayers in property-rich districts, and failed to state a direct or threatened injury caused by the statute. *Id.* The appellate court thus agreed with the trial court that plaintiffs lacked standing to challenge section 18-8.05 of the School Code, and affirmed the trial court's order granting defendants' motion to dismiss with prejudice on that basis.

¶ 25                                           ANALYSIS

¶ 26    Plaintiffs now appeal the appellate court's affirmance of the circuit court's dismissal of their complaint. Plaintiffs argue that they have standing to challenge the state's educational funding system, and argue that their complaint states a claim for violation of the equal protection clause.

¶ 27    Defendants' motion to dismiss plaintiffs' complaint was brought pursuant to section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2010)). Section 2-619.1 allows a party to file a combined section 2-619 and 2-615 motion to dismiss. A section 2-615 motion to dismiss attacks the legal sufficiency of a complaint (*Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004)), while a section 2-619 motion to dismiss admits the sufficiency of the complaint, but asserts an affirmative defense or other matter that avoids or defeats that claim (*Barber v. American Airlines, Inc.*, 241 Ill. 2d 450, 455 (2011)). This court's review of a motion to dismiss under either section 2-615 or section 2-619 is *de novo*. See *Barber*, 241 Ill. 2d at 455; *Vitro*, 209 Ill. 2d at 81.

¶ 28    The doctrine of standing insures that issues are raised only by those parties with a real interest in the outcome of the controversy. *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23 (2004). In order to have standing to challenge the constitutionality of a statute, a party must have sustained, or be in immediate danger of sustaining, a direct injury as a result of the enforcement of the challenged statute. *Wexler*, 211 Ill. 2d at 23. "The claimed injury must be (1) distinct and palpable; (2) fairly traceable to defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Id.*

¶ 29 In this court, plaintiffs argue that the appellate court erroneously concluded that plaintiffs' injuries flowed from paying particular amounts of taxes, rather than from the inequality of treatment with regard to taxes. Plaintiffs explain that the "gravamen of Plaintiffs' claim is that the State's funding system effectively compels Plaintiffs and other residents of Foundation Level districts to pay higher property tax rates than similarly situated residents of property-wealthy districts in order to achieve the State's specified Foundation Level of funding."

¶ 30 Plaintiffs contend that the state's education funding system expressly establishes three classes of school districts, and the amount of general state aid the system distributes to each of the classified districts is determined by the property tax base from which the districts draw their revenues. Plaintiffs claim that the result of that classification/distribution system is that some taxpayers, in property-poor districts such as plaintiffs' districts, must pay higher taxes than similarly situated taxpayers in property-rich districts, in order to reach the Foundation Level of per-pupil funding. This unequal treatment is directly traceable to the state because it is the state's funding formula, and nothing else, that causes the injury.

¶ 31 Upon review, we agree with the appellate court that plaintiffs' allegations fail to establish that their alleged injury—that they are required to pay higher taxes than similarly situated residents of property-rich school districts—is a direct result of the enforcement of the education funding statute or is fairly traceable to defendants' actions. In so holding, it is important to clarify the exact nature of the statute at issue.

¶ 32 The education funding statute is simply that: a funding statute. It is not a taxing statute. The statute is titled, "Basis for apportionment of general State financial aid and supplemental general State aid to the common schools for the 1998-1999 and subsequent school years." 105 ILCS 5/18-8.05 (West 2010). The statute sets forth a "system of general State financial aid." 105 ILCS 5/18-8.05(A)(1) (West 2010). The purpose of the statute is to "assure that, through a combination of State financial aid and required local resources, the financial support provided each pupil in Average Daily Attendance equals or exceeds a prescribed per pupil Foundation Level." 105 ILCS 5/18-8.05(A)(1) (West 2010). The Foundation Level is defined as "the minimum level of per pupil financial support that should be available to provide for the basic education of each pupil in Average Daily Attendance." 105 ILCS 5/18-8.05(B)(1) (West 2010).

¶ 33 The statute sets forth a formula for determining the amount of state aid to which a school district is entitled. The amount of Available Local Resources, along with the Foundation Level figure, is used in the computation of general state aid allotted to a school district. 105 ILCS 5/18-8.05(E) (West 2010). The statute imputes a level of per pupil Available Local Resources, which includes "a calculated dollar amount representing local school district revenues from local property taxes and from Corporate Personal Property Replacement Taxes, expressed on the basis of pupils in Average Daily Attendance." 105 ILCS 5/18-8.05(D)(1) (West 2010). In determining a school district's revenue from local property taxes, the equalized assessed valuation of all taxable property of each school district is utilized. 105 ILCS 5/18-8.05(D)(2) (West 2010).

¶ 34 Because plaintiffs' argument can be interpreted as suggesting that the local property tax

rates in the statute are based upon the wealth of the school districts, it is important to emphasize that the education funding statute applies a multiplier to calculate local property tax revenues per pupil without regard to the wealth of the district, *i.e.*, whether the district is a Foundation Level District, an Alternative Formula District, or a Flat Grant District. Rather, the multiplier varies depending upon the type of school district. Thus, a 3.00% multiplier is used for all school districts with grades kindergarten through 12, a 2.30% multiplier is used for all school districts with grades kindergarten through eight, and a 1.05% multiplier is used for all school districts with grades 9 through 12. 105 ILCS 5/18-8.05(D)(3) (West 2010).

¶ 35 Further, although the education funding statute assumes a certain local property tax rate in calculating Available Local Resources, the statute does not require school districts to impose that tax rate in order to receive the statutorily determined amount of general state aid. The statute expressly states that "[s]chool districts are not required to exert a minimum Operating Tax Rate in order to qualify for assistance under this Section." 105 ILCS 5/18-8.05(A)(4) (West 2010). Likewise, the statute does not require a school district to actually reach Foundation Level in order to receive general state aid. With regard to the receipt of general state aid, school districts are not penalized or rewarded for taxing at, above, or below the statutorily assumed local property tax rate. School districts receive the statutorily determined general state aid regardless of the local property tax rate actually imposed. It is entirely within the discretion of the school districts to determine the actual rate of local property taxes.

¶ 36 As the appellate court noted, that school districts and not defendants control the amount of local property taxes imposed is evident from the allegations of plaintiffs' complaint. The education funding statute assumed a tax rate of 1.05% for high school districts such as Homewood-Flossmoor Consolidated High School District 233. Nonetheless, Homewood-Flossmoor elected to impose a tax rate of 4.10%. Likewise, the education funding statute assumed a tax rate of 3% for combined elementary and high school districts such as Cairo Unified School District 1, but Cairo Unified School District 1 elected to impose a tax rate of 6.95%.

¶ 37 Even though plaintiffs' school districts taxed at a higher rate than the rate assumed in the education funding statute, the amount of general state aid received by those school districts was not reduced or adjusted to reflect the higher local property tax rates. Again, this is because the education funding statute does not require school districts to actually tax at any certain rate in order to receive general state aid. The local property tax rate figure in the education funding statute is simply used as part of the statutory formula to determine the amount of general state aid allotted to a school district. Consequently, plaintiffs' claims that the imposition of the higher taxes is a direct result of the enforcement of the statute and is fairly traceable to defendants is too attenuated to confer standing in this case.

¶ 38 Plaintiffs respond, however, that other courts have held that standing exists to challenge governmental action if the government is a "but for" cause of the plaintiff's injury, even if the action of a third party is also a necessary cause of the injury. Therefore, plaintiffs maintain that they have standing because they have alleged that the combined effect of the state's school funding formula, along with the severe penalties the state imposes for failure

to meet its mandatory ILS, is to force property-poor school districts to impose, and the residents of those districts to pay, higher tax rates than property-rich districts, in order to reach the basic level of per-pupil funding. Although the state does not directly set property tax rates, plaintiffs contend that the state's actions have had a determinative or coercive effect on local school districts. The state's actions are coercive or determinative because a school district must reach the Foundation Level of funding in order to meet the ILS, and the property-poor school districts must tax at a higher rate than property-rich school districts in order to reach the Foundation Level.

¶ 39    Here, too, we find plaintiffs' allegations to be too attenuated to establish standing. We again point out that the education funding statute is a vehicle to determine the amount of general state aid allocated to school districts. To that end, the statute uses a formula that "imputes a level of per pupil Available Local Resources and provides for the basis to calculate a per pupil level of general State financial aid that, when added to Available Local Resources, equals or exceeds the Foundation Level." 105 ILCS 5/18-8.05(A)(1) (West 2010).

¶ 40    Again, the education funding statute does not require or compel school districts to tax at a certain rate, nor does it require school districts to reach the Foundation Level in order to receive the general state aid to which they are statutorily entitled. In fact, the general state aid is provided to help school districts meet the Foundation Level. See 105 ILCS 5/18-8.05(A)(1) (West 2010) ("The system of general State financial aid provided for in this Section is designed to assure that, through a combination of State financial aid and required local resources, the financial support provided each pupil in Average Daily Attendance equals or exceeds a prescribed per pupil Foundation Level.").

¶ 41    Further, nowhere in the education funding statute is the amount of general state aid tied to a school district's performance with regard to the ILS. As defendants have argued, the education funding statute does not authorize the state to intervene in school districts that continually fail to make progress toward the ILS. The provisions concerning the ILS are contained in an entirely different section of the School Code (105 ILCS 5/2-3.25d, 2-3.25f (West 2010)). Although a school district might decide that more local property tax revenues are required in order to provide its students with a sufficient education to meet the ILS, that decision is left to the school district, and is not compelled or required by the education funding statute.

¶ 42    Plaintiffs cite three cases in support of their "but for" argument. Those cases, however, are distinguishable because the injury in those cases was fairly traceable to the defendants' actions.

¶ 43    For example, in *P&S Grain, LLC v. County of Williamson*, 399 Ill. App. 3d 836 (2010), the plaintiff retail businesses challenged the County School Facility Occupation Tax Law (55 ILCS 5/5-1006.7 (West Supp. 2007)), which allowed county governments to impose a 1% sales tax for school facility use. The appellate court held that the plaintiffs had a real interest in the outcome of the lawsuit because they were subject to the tax they were challenging. *P&S Grain*, 399 Ill. App. 3d at 844. Further, plaintiffs' claim of injury was fairly traceable to the defendants' actions, because the intervener school districts initially requested the tax to be implemented, the defendant Williamson County board passed the ordinances and

completed the procedures that resulted in the implementation of the tax, and the defendant Department of Revenue was charged with the collection and enforcement of the tax. *Id.*

¶ 44 Plaintiffs next cite *Rodgers v. Whitley*, 282 Ill. App. 3d 741 (1996), where property owners and residents in Illinois counties filed an amended complaint asserting that the Property Tax Extension Limitation Act was unconstitutional as to them because it had caused and would continue to cause a deterioration in services provided by taxing bodies that rely on property tax revenue for funding. The appellate court held that the plaintiffs were within the class as to whom the Act was allegedly unconstitutional. *Id.* at 746. In addition, the plaintiffs had alleged a distinct and palpable injury in claiming that the Act led to insufficient funding for taxing bodies, causing a reduction in public services. *Id.* at 747. The injury was clearly traceable to defendants' implementation and enforcement of the Act, and if plaintiffs were granted the relief they sought, the limitations in the generation of revenue which allegedly caused the injury would no longer exist. *Id.*

¶ 45 Plaintiffs also cite *Bennett v. Spear*, 520 U.S. 154 (1997), in support of their argument that the education funding statute is the "but for" cause of their injury. In that case, the Fish and Wildlife Service issued a biological opinion in accordance with the Endangered Species Act of 1973 (16 U.S.C. § 1531 *et seq.*). The plaintiffs alleged that the restrictions imposed by the biological opinion on lake levels would adversely affect them by substantially reducing the quantity of available irrigation water. *Bennett*, 520 U.S. at 167. The plaintiffs filed an action against the Fish and Wildlife Service's director and regional director, and the Secretary of the Interior. The defendants challenged the plaintiffs' standing, arguing that the plaintiffs' injury was not fairly traceable to the Service's biological opinion, because the Bureau of Reclamation retained ultimate responsibility for determining how and whether a proposed action would go forward. *Id.* at 168.

¶ 46 The Supreme Court rejected the defendants' standing argument, stating that the argument "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168-69. Thus, an injury produced by determinative or coercive effect upon the action of someone else would suffice for purposes of standing. In that case, the biological opinion had a "powerful coercive effect on the [Bureau]," because a heavy burden was placed on an agency that disagreed with the biological opinion to articulate its reasons for disagreeing, the biological opinion raised wildlife issues for review that were beyond the Bureau's area of expertise, and the Bureau was potentially exposed to civil and criminal penalties if it erred in disregarding the biological opinion. *Id.* at 169-70.

¶ 47 Plaintiffs argue that the preceding cases are instructive because standing was held to exist as to claims against a governmental entity where that entity's actions were a "but for" cause of the injury, even though other entities' actions were also necessary causes of the injury. Plaintiffs contend that in this case, too, the state's unequal funding formula is a "but for" cause of the unequal treatment of similarly situated taxpayers in school districts throughout Illinois, even though taxes are ultimately imposed by those districts, and not the state.

¶ 48 As stated, we disagree. In contrast to *P&S Grain*, defendants did not request plaintiffs' school districts to impose the higher local property tax rates, did not complete the procedures

that resulted in the implementation of the higher tax rates, and did not collect and enforce the higher taxes.

¶ 49 Likewise, in contrast to *Rodgers*, the higher taxes paid by defendants were not clearly traceable to the defendants' implementation and enforcement of the education funding statute. We repeat. With regard to the Foundation Level and the allocation of general state aid, the education funding statute assumes a school district exerts a sufficient local taxing effort, but ultimately it is up to the school district alone to determine, implement and enforce its property tax rates.

¶ 50 Finally, in contrast to *Bennett*, the education funding statute does not produce a determinative or coercive effect upon plaintiffs' school districts such that the statute is the "but for" cause of plaintiffs' alleged injury. The education funding statute does not expose plaintiffs' school districts to civil or criminal penalties for failing to impose the statutorily assumed local property tax rate. In addition, although the statute endeavors to provide school districts with financial support sufficient to equal or exceed the prescribed per-pupil Foundation Level, the statute does not expressly require a school district to reach the Foundation Level of funding, and imposes no penalty on a school district that does not meet the Foundation Level. Finally, the education funding statute does not tie the allocation of general state aid to a school district's performance on the ILS. Consequently, the "powerful coercive effect" present in *Bennett* is missing in the instant case.

¶ 51 Based upon the foregoing, we find that plaintiffs' alleged injury, paying higher local property taxes than residents of property-rich school districts, is not a direct result of the enforcement of the education funding statute, or fairly traceable to defendants' actions in enacting the education funding statute. Plaintiffs, therefore, do not have standing to bring the instant action against defendants. The circuit court properly granted defendants' motion to dismiss with prejudice.

¶ 52 Given our finding that plaintiffs do not have standing to bring the instant claim, we need not address plaintiffs' additional argument that they have stated a claim for violation of the equal protection clause.

¶ 53                                    CONCLUSION

¶ 54 For all of the foregoing reasons, we affirm the appellate court's judgment, which affirmed the judgment of the circuit court dismissing plaintiffs' complaint with prejudice.

¶ 55 Appellate court judgment affirmed.