**2022 IL 127126**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————

(Docket No. 127126)

ILLINOIS ROAD AND TRANSPORTATION BUILDERS ASSOCIATION *et al.*, Appellants, v. THE COUNTY OF COOK, Appellee.

*Opinion filed April 21, 2022.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Neville, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Justice Theis dissented, with opinion.

**OPINION**

¶ 1     In 2016, an amendment shielding transportation funding from other uses was added to the state revenue article of the Illinois Constitution (Ill. Const. 1970, art. IX, § 11(a)), commonly known as the transportation taxes and fees lockbox amendment or safe roads amendment (Amendment). The Amendment safeguards

proceeds from transportation-related bond proceeds, taxes, fees, excises, and license taxes to ensure that such proceeds are only used for transportation-related purposes. See *id.* In 2018, plaintiffs, a coalition of contracting firms in the public transportation construction and design industry,[1] filed suit in the circuit court of Cook County for declaratory and injunctive relief against the County of Cook (County), asserting that the County was impermissibly diverting revenues generated from six transportation-related ordinances that, pursuant to the Amendment, should have been used only toward certain delineated transportation-related purposes. Following the County's filing of a combined motion to dismiss under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2018)), the circuit court dismissed the complaint, finding that plaintiffs lacked standing and that the complaint failed to state a violation of the Amendment. The appellate court reversed on the issue of standing but affirmed the circuit court's determination that no violation of the Amendment had been stated, albeit for different reasons. 2021 IL App (1st) 190396, ¶ 4. We allowed plaintiffs' petition for leave to appeal. See Ill. S. Ct. R. 315 (eff. Oct. 1, 2020).

¶ 2                                    BACKGROUND

¶ 3        In 2016, nearly 80% of Illinois voters voted to amend the Illinois Constitution of 1970. As a result, section 11, titled "Transportation funds," was added to the state revenue article. See Ill. Const. 1970, art. IX, § 11. In essence, the Amendment provides that money generated from taxes, fees, excises, and license taxes on transportation infrastructure or operations shall only be spent on transportation purposes. *Id.* § 11(a).

¶ 4        On March 6, 2018, plaintiffs, self-described contracting firms in the public transportation construction and design industry, filed suit for declaratory and injunctive relief against the County. All parties agree that the County is a home-rule unit pursuant to article VII, section 6, of the Illinois Constitution of 1970. *Id.* art. VII, § 6(a). Plaintiffs alleged that the County was violating the Amendment by diverting "revenue from transportation-related taxes and fees to the County's Public Safety Fund" and impermissibly spending the revenue on non-transportation-

---

[1]A more detailed description of the member plaintiffs is included in the appellate court opinion. See 2021 IL App (1st) 190396, ¶¶ 24-36.

related purposes. Six sources of revenue allegedly being unconstitutionally diverted away from transportation uses were identified: (1) the Cook County Home Rule County Use Tax Ordinance (see Cook County Code of Ordinances § 74-270 *et seq.* (adopted Feb. 16, 2011); (2) the Cook County Retail Sale of Gasoline and Diesel Fuel Tax Ordinance (see *id.* § 74-470 *et seq.*); (3) the Cook County New Motor Vehicle and Trailer Excise Tax Ordinance (see *id.* § 74-230 *et seq.*); (4) the Cook County Home Rule Use Tax Ordinance for Non-Retailer Transfers of Motor Vehicles (see Cook County Code of Ordinances § 74-595 *et seq.* (adopted Nov. 15, 2011)); (5) the Cook County Wheel Tax on Vehicles Ordinance (see Cook County Code of Ordinances § 74-550 *et seq.* (adopted May 21, 2020)); and (6) the Cook County Parking Lot and Garage Operations Tax Ordinance (see Cook County Code of Ordinances § 74-510 *et seq.* (adopted July 17, 2013)). These taxes will be referred to collectively as the "Cook County Transportation Taxes." See 2021 IL App (1st) 190396, ¶ 8.

¶ 5        Plaintiffs' prayer for relief seeks the following: entry of declaratory judgment that the County's diversion of revenue from the Cook County Transportation Revenue Ordinances to undifferentiated costs within the Public Safety Fund is unconstitutional; that plaintiffs be awarded preliminary and permanent injunctive relief to enjoin the County from diverting revenue derived from the Cook County Transportation Revenue Ordinances to any purpose other than those provided in subsection (b) and (c) of the Amendment; to mandate that the County restore all such diverted revenue; to order the County to provide plaintiffs a line-item accounting of how the County allocates or appropriates revenue derived from the Cook County Transportation Revenue Ordinances; the award of reasonable attorney fees to plaintiffs; and any such other award and further relief as deemed proper.

¶ 6        The County filed a motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure. 735 ILCS 5/2-619.1 (West 2018). Specifically, the County asserted that the complaint should be dismissed pursuant to section 2-619 because plaintiffs lack standing and because, pursuant to section 2-615, "allocation of revenue to the Public Safety Fund is proper under the Amendment's legislative history and ballot summary." See *id.* §§ 2-615, 2-619. The circuit court dismissed the complaint, finding that plaintiffs lacked standing and that the complaint failed to state a constitutional violation.

¶ 7         The appellate court disagreed as to the issue of standing, concluding that plaintiffs had established associational standing. 2021 IL App (1st) 190396, ¶ 56. The court thus did not reach plaintiffs' alternative contention that they had standing as taxpayers. *Id.* However, the court affirmed the circuit court's section 2-615 dismissal. *Id.* ¶ 167. After finding the language of the Amendment ambiguous, the court looked to extrinsic aids, namely, legislative debates, the Secretary of State's published explanations of the Amendment that were sent to Illinois voters (ballot summary) (see Ill. Const. 1970, art. XIV, § 2(b)), and the Transportation Funding Protection Act (see Pub. Act 101-32 (eff. June 28, 2019) (adding 30 ILCS 178/5-10)). 2021 IL App (1st) 190396, ¶¶ 156-57. The legislative debates, according to the court, demonstrated that "[t]he Amendment restricts the spending of transportation-related tax revenues when the spending of that revenue is dictated by state law, but it does not impact a home-rule unit's spending of revenue pursuant to its constitutional home-rule spending power." *Id.* ¶ 143. Further, the language contained in the ballot summary better comported with the County's position because, according to the court, plaintiffs' interpretation would result in alteration of home-rule powers. *Id.* ¶¶ 149-50.

¶ 8         We allowed plaintiffs' petition for leave to appeal. See Ill. S. Ct. R. 315 (eff. Oct. 1, 2020). We also allowed the following parties to file *amicus curiae* briefs: Representatives Jim Durkin and Ryan Spain; Representative Jay Hoffman; the Illinois Chamber of Commerce; the International Union of Operating Engineers, Local 150, AFL-CIO, *et al.*; the Indiana, Illinois, Iowa Foundation for Fair Contracting, *et al.*; and the City of Chicago, City of Berwyn, and Village of Bridgeview. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 9                                    ANALYSIS

¶ 10        This appeal comes to this court following the circuit court's dismissal of plaintiffs' complaint pursuant to section 2-619.1. See 735 ILCS 5/2-619.1 (West 2018). "Section 2-619.1 allows a party to file a combined section 2-619 and 2-615 motion to dismiss." *Carr v. Koch*, 2012 IL 113414, ¶ 27. "A section 2-615 motion to dismiss attacks the legal sufficiency of a complaint [citation], while a section 2-619 motion to dismiss admits the sufficiency of the complaint, but asserts an affirmative defense or other matter that avoids or defeats that claim [citation]." *Id.*

- 4 -

Though plaintiffs only seek review of the section 2-615 issue, *i.e.*, whether they have asserted a claim for a constitutional violation of the Amendment, the County's request for cross-relief requires our consideration of the section 2-619 issue, which is whether plaintiffs have standing. We review a motion to dismiss under either section 2-615 or section 2-619 *de novo*. *Id.* We turn first to the issue of standing.

¶ 11                                I. Standing

¶ 12     Because it is an affirmative defense, it is defendant's burden to plead and prove lack of standing. *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 45 (2005) (citing *Chicago Teachers Union, Local 1 v. Board of Education of the City of Chicago*, 189 Ill. 2d 200, 206 (2000)). Lack of standing avoids the legal effect of or defeats the plaintiff's claim. See 735 ILCS 5/2-619 (West 2018); *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999). "Where standing is challenged in a motion to dismiss under section 2-619, a court must accept as true all well-pleaded facts in plaintiff's complaint and all inferences that can reasonably be drawn in plaintiff's favor." *In re Estate of Schlenker*, 209 Ill. 2d 456, 461 (2004).

¶ 13     A plaintiff has standing where there has been some injury in fact to a legally cognizable interest, *i.e.*, "the claimed injury, whether 'actual or threatened' [citation] must be: (1) 'distinct and palpable' [citation]; (2) 'fairly traceable' to the defendant's actions [citation]; and (3) substantially likely to be prevented or redressed by the grant of the requested relief [citations]." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988). Furthermore, where the cause of action seeks declaratory relief, "there must be an actual controversy between adverse parties, with the party requesting the declaration possessing some personal claim, status, or right which is capable of being affected by the grant of such relief." *Id.* at 493.

¶ 14     The County maintains that plaintiffs lack associational standing. An association may have standing to sue on behalf of its members where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1997); *International Union of Operating Engineers, Local 148*, 215 Ill. 2d at 46.

¶ 15 According to the County, plaintiffs have not identified any "distinct and palpable" injury. See *Greer*, 122 Ill. 2d at 492-93. Thus, the County contends that the first requirement for associational standing—that an association's members would otherwise have standing to sue in their own right—is not met. See *International Union of Operating Engineers, Local 148*, 215 Ill. 2d at 46. In the complaint, plaintiffs alleged that the County's diversion of the subject funds "is depriving the plaintiffs' members of opportunities to work to improve the County's failing transportation infrastructure." Per the County, this is insufficient to show that any of plaintiffs' members " 'are suffering immediate or threatened injury as a result of the challenged action.' " See *id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To determine whether the County has shown that plaintiffs' members are not suffering immediate or threatened injury as a result of the challenged action requires consideration of whether plaintiffs' members have suffered (1) a distinct and palpable injury that (2) is fairly traceable to defendant's actions and (3) is substantially likely to be prevented or redressed by the relief sought. See *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 23 (2004).

¶ 16 Plaintiffs are a coalition of nonprofit associations representing businesses in every sector of the transportation infrastructure construction and design industry. As noted by the appellate court, many individual members of the plaintiff associations are based in Cook County; conduct business with Cook County; and/or produce or supply material, equipment, or services to Cook County or to those working in Cook County. See 2021 IL App (1st) 190396, ¶¶ 24-36.

¶ 17 First, we find that the County has failed to show that plaintiffs have not suffered a "distinct and palpable injury." "A distinct and palpable injury refers to an injury that cannot be characterized as 'a generalized grievance common to all members of the public.' " *Alliance for the Great Lakes v. Department of Natural Resources*, 2020 IL App (1st) 182587, ¶ 32 (quoting *Greer*, 122 Ill. 2d at 494). Where plaintiffs have hundreds of millions of dollars' worth of job opportunities they stand to benefit from, plaintiffs cannot be said to have a mere curiosity or concern for the outcome of the instant controversy. See *Messenger v. Edgar*, 157 Ill. 2d 162, 171 (1993). By way of contrast, in *Chicago Teachers Union, Local 1*, the plaintiffs

challenged the "constitutionality of section 2-3.25g of the Illinois School Code (105 ILCS 5/2-3.25g (West 1996)), which allows school districts to petition the State Board of Education for waiver or modification of the School Code's mandates." 189 Ill. 2d at 202. Relevant here, this court considered whether two plaintiffs—physical education teachers—had standing to challenge the statute. *Id.* at 205. Because the statute would allow eleventh and twelfth grade students the choice of whether to take physical education courses, the two plaintiffs alleged that the law diminished the need for physical education teachers, which in turn would diminish their job security and career opportunities. *Id.* at 207. This court declined to find that the teachers had sustained or were in immediate danger of sustaining a direct and palpable injury. *Id.* at 208. Even if the size or number of physical education classes were reduced, the change would not necessarily harm the two teachers. *Id.* The two teachers both had tenure, and thus, "[i]f their services were not needed to teach eleventh and twelfth grade pupils, they would still have the opportunity to provide instruction to ninth and tenth grade students, for whom there has been no waiver of the daily physical education course requirement." *Id.*

¶ 18        Here, plaintiffs assert that the County's yearly diversion of revenue from the Cook County Transportation Taxes has already decreased the number of projects that are available to bid on in Cook County, which results in loss of business opportunities. See 2021 IL App (1st) 190396, ¶ 36. Unlike in *Chicago Teachers Union, Local 1*, where the plaintiff teachers' tenure afforded them protection against diminution of job security despite the real potential of physical education classes being reduced or eliminated, here, the diversion of more than $200 million[2] worth of funds per year that are earmarked for transportation purposes certainly would negatively affect the pool of jobs and contracts available to plaintiffs' members. As plaintiffs state in their complaint, its members would be "suffering economic harm due to the County's ongoing violations of [the Amendment]." "Economic injuries have long been recognized as sufficient to lay the basis for standing ***." *Greer*, 122 Ill. 2d at 493. Accordingly, we find that the claimed injury is one that is distinct and palpable.

---

[2]As observed in the County's brief, in the County's fiscal year 2017, the funds collected via the Cook County Tax Ordinances were estimated to total more than $247 million. Plaintiffs do not dispute this estimation.

¶ 19    Next, the County disputes that plaintiffs satisfy the next two prongs, *i.e.*, that the injury is fairly traceable to its actions and is substantially likely to be prevented or redressed by the requested relief. See *id.* We agree with the appellate court's characterization of the County's arguments as "interweav[ing] the traceability and judicial-redress prongs in a manner that we could summarize in one word— speculation." 2021 IL App (1st) 190396, ¶ 38. Essentially, the County contends that, even if plaintiffs were to prevail, it is not necessarily a given that any one member will receive additional business. For example, the County notes that home-rule units could react by proportionally reducing their transportation-related revenues to keep transportation spending flat or spending transportation-related revenues on activities that do not involve construction or, if discretionary spending on transportation-related construction does increase, the spending may nevertheless flow to nonplaintiffs. The County's brief details numerous ways in which a home-rule unit would avoid spending transportation funds in a way that financially benefits plaintiffs' members.

¶ 20    We are not persuaded by the County's argument that there are too many steps of attenuation between plaintiffs' success in this case and a given member being able to show that they would receive business. For example, the County asserts that it would "reconfigure" its revenue sources to allow it to fund government according to its "predetermined priorities," *e.g.*, public safety, public health, public housing, waste management, water and sewer infrastructure, and parks and recreational opportunities for residents. In an explanation of how, the County vaguely provides that it "would alter its mix of revenue, perhaps even adding new sources of revenue, in order to maintain funding for its predetermined priorities." Simply, we decline to speculate that *the County* would or could so radically change its revenue sources in a way that would prevent *any* increase in transportation infrastructure projects.

¶ 21    Further, we are likewise unimpressed by the County's suggestion that it would from here on out manage to spend the funds on only transportation-related projects that do not even incidentally involve infrastructure or require the types of products or services plaintiffs' members provide. The County represents that it could, for example, choose to only spend the money on "the costs of administering laws related to vehicles and transportations," "payment of highway obligations," and "costs for *** betterment of *** mass transit *** or other forms of transportation,"

which might involve "purchasing a new fleet of buses, train cars, or even bicycles and scooters." See Ill. Const. 1970, art. IX, § 11(b), (c).

¶ 22    The County contends the above distinguishes the instant case from *U.S. Women's Chamber of Commerce v. (RBW) U.S. Small Business Administration*, No. 1:04-CV-01889, 2005 WL 3244182 (D.D.C. Nov. 30, 2005) (*SBA*), where the plaintiffs had submitted unsuccessful bids and thus lost certain contracts. The County stresses that, unlike in *SBA*, plaintiffs do not claim that they lost any contracts during bidding.

¶ 23    Like the appellate court, we are inclined to agree with plaintiffs' position that such certainty is not required. See 2021 IL App (1st) 190396, ¶ 40. *SBA* held that an association of women contractors had standing to challenge a governmental defendant's failure to complete a congressionally mandated study and establish procedures to identify underrepresented women-owned small businesses in federal procurement contracts. 2005 WL 3244182, at *1. The defendant argued that the plaintiffs did not have standing because not all women-owned small businesses would benefit, the industries that would benefit had not been identified, and even qualifying businesses might not benefit due to a competitive contract process. *Id.* at *4. The *SBA* court observed that, as to the traceability prong, "the plaintiff must only prove that if not for defendants['] unreasonable delay ***, 'it reasonably could be inferred that' had the defendants conducted the study and adopted the procedures[,] *** 'there is a substantial probability' that one of its members would have benefitted." *Id.* at *8 (quoting *Warth*, 422 U.S. at 504). The plaintiffs argued, and the *SBA* court agreed, that the defendant's argument imposed a "catch-22." (Internal quotation marks omitted.) *Id.* Essentially, the defendant was illegally refusing to implement the mandates but arguing that its refusal to do so insulated it from judicial review. *Id.* Accordingly, the court "decline[d] to adopt the defendants' circular reasoning as justification for denying the plaintiff standing." *Id.* Further, as to judicial redressability, the court held that "it need not be shown that the Women's Act's implementation would have definitely resulted in contracts being awarded to the plaintiff's members." *Id.* at *9. Instead, it need only be *substantially probable* that "the defendants' failure to comply caused the plaintiff's members to be denied the federal contracts they bid on." *Id.*

¶ 24    We are not persuaded by the County's argument that *SBA* is distinguishable due to the instant plaintiffs' members not being able to show that they bid on a contract and further that they lost contracts during bidding. Were we to adopt this position, we would be permitting parties, namely government entities, to artificially create situations where would-be plaintiffs would never have the opportunity to challenge government misconduct. This, in fact, is what plaintiffs allege has happened here:

> "the County is weaponizing its unconstitutional behavior to insulate itself from judicial review: divert transportation funds, thereby fail to fund new transportation projects, and then claim that the firms that would have been eligible to bid on this work lack standing because they cannot point to any projects they lost out on. Under that circular theory, say plaintiffs, nobody could ever challenge the County's alleged unconstitutional diversion of funds." 2021 IL App (1st) 190396, ¶ 39 (describing plaintiffs' response to the County's arguments as to the traceability and judicial-redress prongs).

Accordingly, we dismiss the County's argument regarding *Hunt*, 432 U.S. 333, which the County contends is distinguishable for the same reasons as *SBA*, *i.e.*, because the plaintiffs in *Hunt* alleged actual, concrete, nonspeculative injuries in that they were incurring extra costs by virtue of North Carolina's labeling law. Here, the plaintiffs cannot show an exact injury due to the County's conduct. We also add that Illinois law "tends to vary in the direction of greater liberality" than federal law on matters of standing. *Greer*, 122 Ill. 2d at 491.

¶ 25    Again, for these same reasons, we reject the County's reliance upon *I.C.S. Illinois, Inc. v. Waste Management of Illinois, Inc.*, 403 Ill. App. 3d 211 (2010). According to the County, "even assuming Cook County were to end up spending transportation-related revenues on construction projects, none of plaintiffs' members can show that they would have won a bid on any such project." The County argues that, unlike here, in *I.C.S.* there was a specific contract and the primary contractor was in place. *Id.* at 212-13. However, as here, the plaintiff subcontractors alleged that they were "deprived of the opportunity to bid." *Id.* at 225. Nonetheless, the *I.C.S.* court held that the plaintiffs did not have standing because they did not allege a legally cognizable injury. *Id.* at 233-34. Specifically, the *I.C.S.* court held:

"a plaintiff cannot establish standing to challenge the result of a bidding competition without establishing that he would have been successful but for defendants' conduct. Without such an allegation, a subcontractor would be hard put to claim to have suffered an injury. It is all the more difficult to recognize an injury to a legally cognizable interest that is distinct and palpable if plaintiff does not allege that he, at the very least, actively entered into the competitive fray." *Id.* at 225.

We also agree with the appellate court that *I.C.S.* is distinguishable. See 2021 IL App (1st) 190396, ¶¶ 52, 59 (noting that *I.C.S.* did not involve a suit for declaratory or injunctive relief against the government but concerned a class action brought by private firms against a private contractor that sounded in tort and sought lost profits for failing to pick a plaintiff for a subcontracting job). Further, as noted by plaintiffs, plaintiffs are not challenging the award of any contract to a competitor or the outcome of any bidding process and they do not assert tort claims or seek the award of lost profits from a competitor. We reject the County's citation of *I.C.S.* and now address the traceability and judicial-redress prongs.

¶ 26    If the County is required to exclusively spend the subject funds on transportation purposes but is instead impermissibly diverting the funds to other purposes, then there is no question that plaintiffs' injury is " 'fairly traceable' " to the County's conduct. See, *e.g.*, *Greer*, 122 Ill. 2d at 494. The County does not explain how plaintiffs misidentify its control and unpermitted diversion of funds as the cause of their injury. See, *e.g.*, *Carr*, 2012 IL 113414, ¶¶ 36, 51 (finding that the plaintiffs' alleged injury—paying higher local property taxes than residents of property-rich school districts—was not fairly traceable to the defendants' actions in enacting an education funding statute because the defendants did not have control over the amount of local property taxes that were imposed). Similarly, if plaintiffs are granted the relief sought, hundreds of millions of dollars would be diverted back to transportation purposes, which would be substantially probable to inure to plaintiffs' economic benefit and thus remedy their alleged injury. See *Greer*, 122 Ill. 2d at 493.

¶ 27    Lastly, we reject the County's arguments regarding several federal cases that the appellate court cited in support of the proposition that certainty as to judicial redress is not required for standing, "[p]articularly when the injury to a plaintiff is

the loss of opportunity to obtain a benefit due to the government's failure to perform a required act *** [because] it is rarely possible to know with any confidence what *might* have happened" had the government performed the act at issue or the improper conduct had been corrected. (Emphasis in original.) 2021 IL App (1st) 190396, ¶ 40; see also *id.* ¶¶ 41-49 (discussing cases). With regard to *West Virginia Ass'n of Community Health Centers, Inc. v. Heckler*, 734 F.2d 1570 (D.C. Cir. 1984), *National Ass'n of Neighborhood Health Centers, Inc. v. Mathews*, 551 F.2d 321 (D.C. Cir. 1976), and *American Iron & Steel Institute v. Occupational Safety & Health Administration*, 182 F.3d 1261 (11th Cir. 1999), the County asserts that these cases are distinguishable because the allegedly misappropriated funds at issue were directly earmarked to fund programs to benefit organizations and/or individuals such as the plaintiffs in those cases. As plaintiffs correctly observe, the County's argument invokes the "zones of interest" test that was rejected by this court in *Greer*, 122 Ill. 2d at 491-92 (explaining that the zones of interest test requires consideration of the goals, purposes, and objectives of a given law to determine whether plaintiffs are among its intended beneficiaries and whether plaintiffs' asserted interest falls within that is arguably sought to be protected by such a provision). Accordingly, the County's arguments are again off-target and do not establish the affirmative defense that plaintiffs lack standing.

¶ 28     Because we conclude that plaintiffs have associational standing, we need not address the County's argument that plaintiffs lack standing as taxpayers. We now turn to the party's substantive arguments.

¶ 29                              II. Scope of the Amendment

¶ 30     At issue is the scope of the Amendment—whether it applies without exception to revenues generated from transportation-related taxes even where the taxing body is a home-rule unit. See *Kanerva v. Weems*, 2014 IL 115811, ¶ 35 (noting that such a question presents a question of constitutional interpretation). We will first set forth the parties' general arguments and later address their more specific assertions.

¶ 31     Plaintiffs maintain that the Amendment contains no exemption for home-rule units of government or for expenditures of transportation tax revenue pursuant to home-rule authority. According to plaintiffs, subsection (a) explains which taxes and fees fall within the Amendment's scope. Plaintiffs note how subsection (d)

supports their characterization of subsection (a). Subsection (d) states how subsection (a) "describe[s]" the "revenues" that shall not be "diverted to any purpose" other than the purposes "described in subsections (b) and (c) of this Section." See Ill. Const. 1970, art. IX, § 11(d). Specifically, plaintiffs cite the broadness of subsection (a)'s language. Subsection (a) states that "[n]o moneys, including bond proceeds, derived from taxes, fees, excises, or license taxes relating to" certain types of transportation infrastructure or "relating to any other transportation infrastructure or transportation operation, shall be expended for purposes other than" the transportation purposes specified elsewhere in the Amendment. *Id.* § 11(a). Because the Cook County Transportation Taxes relate to transportation infrastructure and operations, plaintiffs contend that they fall within the ambit of the Amendment. Accordingly, plaintiffs maintain that the funds collected from the Cook County Transportation Taxes may only be spent on those purposes delineated in subsections (b) and (c). Subsection (f), which provides that "[f]ederal funds may be spent for any purposes authorized by federal law" demonstrates that, when the drafters wanted to create an exemption for certain funds, they did so expressly. See *id.* § 11(f). Plaintiffs stress that the drafters did not create an exemption for home-rule units, home-rule taxes, or home-rule expenditures.

¶ 32    In turn, the County's brief states:

"Plaintiffs can only get to this outcome by urging the Court to read subsection (a) of the Amendment in narrow isolation and to put blinders on against the overall picture—blinders to the Amendment's overall import, blinders to the stated intent of the bill's sponsors, and blinders to what Illinois voters were told about the limits of the Amendment's impact."

The County explains that plaintiffs' interpretation of subsection (a) fails as a matter of statutory construction because the Amendment as a whole can only be read to apply exclusively to state-imposed tax revenues, not revenues imposed by home-rule authority. The County asserts that "[a] constitutional provision must be construed, if possible, in a manner consistent with other provisions relevant to the same subject matter." *Rock v. Thompson*, 85 Ill. 2d 410, 429 (1981) (citing *People ex rel. Nauert v. Smith*, 327 Ill. 11 (1927)). Thus, according to the County, it is appropriate to consider the various subsections of the Amendment together to

properly ascertain its meaning. By reading the Amendment's provisions as a whole, the County contends that the lower courts have neither deleted nor inserted any language into subsection (a). Additionally, the County notes that the Amendment refers to "statutory purposes" and "laws"—not "ordinances"—thus indicating the intent to encompass only statutorily derived revenue. See Ill. Const. 1970, art. IX, § 11(b), (c). Plaintiffs counter that subsection (a) is the sole provision that "describe[s]" which funds are restricted by the Amendment. Accordingly, the other subsections should not have been used by the appellate court to limit subsection (a)'s scope.

¶ 33    We now consider whether the Amendment is plain or ambiguous. "The construction of constitutional provisions is governed by the same general principles that apply to statutes." *Kanerva*, 2014 IL 115811, ¶ 36 (citing *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 526-27 (1990)). When construing a constitutional provision, our objective "is to determine and effectuate the common understanding of the citizens who adopted it [citations], and courts will look to the natural and popular meaning of the language used as it was understood when the constitution was adopted [citation]." *Id.* A court should "first and foremost look to the plain language." *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 47. If the language of the provision is plain, we will give effect to the language and will not consider extrinsic aids of construction. *Kanerva*, 2014 IL 115811, ¶ 36. Accordingly, "[o]nly if the provision is ambiguous will we 'consult the drafting history of the provision, including the debates of the delegates to the constitutional convention.' " *Hooker*, 2016 IL 121077, ¶ 35 (quoting *Walker v. McGuire*, 2015 IL 117138, ¶ 16).

¶ 34    We turn first to subsection (a) of the Amendment, which the County argues is the determinative provision. Subsection (a) provides:

"(a) No moneys, including bond proceeds, derived from taxes, fees, excises, or license taxes relating to registration, title, or operation or use of vehicles, or related to the use of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or to fuels used for propelling vehicles, or derived from taxes, fees, excises, or license taxes relating to any other transportation infrastructure or transportation operation, shall be expended for purposes other than as provided in subsections (b) and (c)." Ill. Const. 1970, art. IX, § 11(a).

¶ 35    At the outset, it is evident that "[n]o moneys" is an extremely broad designation of the category of proceeds generated by certain bond proceeds, taxes, fees, excises, and license taxes. Subsection (a) first notes that the bond proceeds, taxes, fees, excises, and license taxes it is addressing "relat[e] to registration, title, or operation or use of vehicles, *** the use of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or to fuels used for propelling vehicles." *Id.* However, subsection (a) then goes even further, providing that the Amendment also applies to "taxes, fees, excises, or license taxes *relating to any other transportation infrastructure or transportation operation.*" (Emphasis added.) *Id.* Again, subsection (a) clearly demonstrates an intent by the drafters to encompass the entire swath of proceeds from taxes, fees, excises, and license taxes by using the above-italicized catchall language. Specifically, "any other" means everything else not already listed. Subsection (a) effectively states that such money, *i.e.*, "[n]o moneys [*i.e.*, all moneys derived from transportation-related taxes, etc.] *** shall be expended for purposes other than as provided in subsections (b) and (c)." *Id.* Certainly, there is nothing in the language of subsection (a) to indicate that the drafters intended to exclude home-rule units, home-rule taxes, or home-rule expenditures from the scope of the Amendment.

¶ 36    Nonetheless, the County maintains that the Amendment's various references in subsections (b) and (c) to "laws" and derivations of the word "statute" refer to acts of the General Assembly and not ordinances. See *id.* art. IV, §§ 8, 9; *Burritt v. Commissioners of State Contracts*, 120 Ill. 322 (1887); *Illinois State Toll Highway Authority v. American National Bank & Trust Co. of Chicago*, 162 Ill. 2d 181, 200 (1994) (stating that "as provided by law" means as prescribed or provided by the General Assembly). We reject this strained and unnatural reading. The references to "laws" and derivations of the word "statute" do not appear in subsection (a). Though subsections (b) and (c) no doubt contain these references, we fail to see how they implicitly modify the Amendment's scope in the way proposed by the County. Furthermore, subsection (b) refers to "local governments." See Ill. Const. 1970, art. IX, § 11(b). It does not distinguish between home-rule units and non-home-rule units. Unlike the County and the appellate court, which rely on this collective term to assign greater meaning to the terms "laws" and derivations of the word "statute," we find that it supports our conclusion as to subsection (a)'s expansive reach.

- 15 -

¶ 37    Subsection (b) provides:

> "(b) Transportation funds may be expended for the following: the costs of administering laws related to vehicles and transportation, including statutory refunds and adjustments provided in those laws; payment of highway obligations; costs for construction, reconstruction, maintenance, repair, and betterment of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or other forms of transportation; and other statutory highway purposes. Transportation funds may also be expended for the State or local share of highway funds to match federal aid highway funds, and expenses of grade separation of highways and railroad crossings, including protection of at-grade highways and railroad crossings, and, with respect to local governments, other transportation purposes as authorized by law." *Id.*

Clearly, subsection (b) provides a list of permissible ways in which transportation funds may be expended. Subsection (b) contains two sentences. The first sentence provides four categories of permissible purposes, which are separated by semicolons. Although the first and fourth purposes contain the terms "laws" and "statutory," the second and third categories are not modified by these terms. The County fails to explain how, for example, both home-rule units and non-home-rule units would not be able to spend funds on "costs for construction, reconstruction, maintenance, repair, and betterment of *** roads, streets, [or] bridges" absent statutory directive to do so. See *id.* For this same reason, the County's reliance upon the word "laws" in subsection (c) is likewise unavailing. Subsection (c) simply builds upon the first category of permissible spending listed in subsection (b), *i.e.*, "the costs of administering laws related to vehicles and transportation." See *id.* § 11(b), (c). That gives us no reason to read the Amendment as the County suggests. We will not read a limitation into subsection (a) that the County and the appellate court infer from other subsections. See *Gutraj v. Board of Trustees of Police Pension Fund*, 2013 IL App (2d) 121163, ¶¶ 14-15; see also *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 660-61 (2005).

¶ 38    As to the second sentence of subsection (b), the County contends that the clause "and, with respect to local governments, other transportation purposes as authorized by law" also demonstrates that the Amendment is only referring to when state and local governments are "following the spending dictates of a statute"—not when

local governments are spending their own funds pursuant to their home-rule spending authority. See 2021 IL App (1st) 190396, ¶ 107. As the appellate court put it:

> " 'Authorized by law,' as we have said, means authorized by statute. The reference there to 'local governments' includes both home-rule and non-home-rule units, of course. The fact that this language treats home-rule and non-home-rule units the same, both requiring 'authoriz[ation] by law,' is telling because home-rule units do not always require authorization by law when they spend tax revenue. As noted at length above, sometimes, a statute authorizes a home-rule unit to impose a tax but does not mandate how that home-rule unit will spend the tax revenue ***. And of course, other times, a home-rule unit will impose a tax based on its own constitutional taxing power and will spend that tax revenue under its general home-rule powers, with no statute entering the picture at all. If plaintiffs are correct that revenues spent pursuant to traditional home-rule power are included within this scope, what 'authorization by law' should that home-rule unit consult? If no statute governs its spending, what statute could the home-rule unit possibly consult for authority?

> This language only makes sense one way: In allowing for 'local governments' to spend transportation tax revenues for 'other transportation purposes as authorized by law,' the Amendment can only be referring to those situations where home-rule and non-home-rule units have the same spending powers—which is when, and only when, *they are following the spending dictates of a statute*. It is nearly impossible to reconcile plaintiffs' position, that all revenue spending is restricted by this Amendment, even that which is *not* governed by statute, with this language in the second sentence of subsection (b)." (Emphases in original.) *Id.* ¶¶ 106-07.

Again, the first sentence of subsection (b) details four categories of permissible spending—and the County does not explain how the third category does not apply to local governments even absent statutory dictate.[3] Before the last clause of the second sentence ("with respect to local governments, other transportation purposes as authorized by law"), the second sentence begins by explaining that

---

[3]We express no opinion on whether the other categories of spending could nonetheless apply to local government units.

- 17 -

"[t]ransportation funds *may also* be expended for." (Emphasis added.) Ill. Const. 1970, art. IX, § 11(b). The second sentence is simply setting forth another category of a yet-to-be-defined aspect that may fall under the umbrella of relating to transportation. Nothing about the phrase "may also" demonstrates the County's or the appellate court's hard-and-fast notion that, as to local governments—non-home-rule units and home-rule units alike—a statute always must be dictating how money is being spent. Furthermore, this phrase does not modify the third category of spending listed in the first sentence of subsection (b). Accordingly, even entertaining the County's argument on this point, subsection (b) provides a clear category of permissible spending that is not qualified by "laws" or derivations of the word "statute."

¶ 39    The County's cited cases fall short of supporting its contention that "as authorized by law" can only mean that a statute is in place that specifically directs the *spending* of both non-home-rule units and home-rule units. *Burritt* held that a joint resolution by both houses did not yet constitute a law because it did not comply with certain constitutional mandates, *e.g.*, because it was "without a title, ha[d] no enacting clause, [wa]s not signed by Speakers of both houses, or either house, [and] ha[d] not the signature and approval of the executive." *Burritt*, 120 Ill. at 333. No one disputes the proper lawmaking process in this case.

¶ 40    Next, *Illinois State Toll Highway Authority* explained that "[t]he language 'as provided by law' contained in article I, section 15 (Ill. Const. 1970, art. I, § 15), means that the requirements for jury trials in eminent domain actions are within the General Assembly's authority to determine." 162 Ill. 2d at 191-92. *Illinois State Toll Highway Authority* also stated that " '[a]s provided by law' means as prescribed or provided by the General Assembly." *Id.* at 200. For this proposition, *Illinois State Toll Highway Authority* relied on *Peile v. Skelgas, Inc.*, 242 Ill. App. 3d 500, 518 (1993). *Illinois State Toll Highway Authority* also rejected the plaintiffs' argument that, relevant here, it should have been awarded attorney fees under the state constitution. 162 Ill. 2d at 199-200. This court explained that because article I, section 15, guarantees just compensation " 'as provided by law' " that "attorney fees and expenses should not be allowed unless specifically authorized by statute." *Id.* at 200. Because no statute provided for the award of attorney fees and expenses in the context at issue, the court held that

- 18 -

"reimbursement of attorney fees is not required as part of just compensation under our constitution." *Id.*

¶ 41    As mentioned, *Illinois State Toll Highway Authority* relied on *Peile* for the proposition that " '[a]s provided by law' means as prescribed or provided by the General Assembly." *Id.* In support of this statement, *Peile* in turn relied on three cases. See *Peile*, 242 Ill. App. 3d at 518 (citing *Quinn v. Donnewald*, 107 Ill. 2d 179 (1985), *County of Kane v. Carlson*, 140 Ill. App. 3d 814 (1986), and *Oak Park Federal Savings & Loan Ass'n v. Village of Oak Park*, 54 Ill. 2d 200 (1973)). We examine these cases in turn.

¶ 42    At issue in *Quinn* was whether the Compensation Review Act (Act) (Ill. Rev. Stat. 1984 Supp., ch. 63, ¶ 901 *et seq.*), which created the Compensation Review Board (Board), unconstitutionally delegated the legislature's power to determine the salaries of certain state officers to the Board. *Quinn*, 107 Ill. 2d at 183. Per the Illinois Constitution of 1970, "the salaries of legislators, judges, and executive officers shall be 'provided' or 'established' 'by law.' " *Id.* at 186 (quoting Ill. Const. 1970, art. IV, § 11, *id.* art. VI, § 14, and *id.* art. V, § 21). The plaintiffs complained that the legislature itself was charged with setting the salaries and thus could not delegate this power to the Board. *Id.* This court rejected the plaintiffs' argument because, by and large, all the Board did was make recommendations to the legislature. *Id.* Pursuant to the Act, the legislature still ultimately set the salaries in compliance with "the 'law-making process' and in the normal legislative manner." *Id.* at 186-87. Accordingly, the Act did not run afoul of the constitutional directive. *Id.* at 187.

¶ 43    The second case relied on by *Peile* was *County of Kane*. There, the dispute ultimately concerned whether the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1984 Supp., ch. 48, ¶ 1601 *et seq.*) violated the separation of powers provision of the state constitution. *County of Kane*, 140 Ill. App. 3d at 815-16. Relevant here, it was argued that, because provisions of the Public Labor Relations Act required collective bargaining with respect to wages in collective bargaining agreements for deputy circuit clerks, it was an overly burdensome infringement on the powers of the judicial branch. *Id.* at 819. In response, the appellate court observed that, as to the wages of deputy circuit clerks, "the constitution specifically authorizes action by the General Assembly." *Id.*; see also *id.* (citing Ill. Const. 1970, art. VI, § 18(c)).

The appellate court explained: "deputy circuit clerks are nonjudicial officers within the meaning of section 18 of article VI of the constitution. The requirement that the salaries be 'as provided by law' means that they are to be set by the General Assembly via the lawmaking process." *Id.* (citing *Quinn*, 107 Ill. 2d at 186-87). It was, according to the appellate court, permissible for the legislature to satisfy this requirement in different ways. *Id.* According to the court, "[t]here would appear to be no constitutional impediment to the legislature's providing by law that deputy circuit clerks' salaries be determined by a process including collective bargaining." *Id.* Thus, it was not a violation of separation of powers where the constitution specifically grants the legislature the authority to provide by law. *Id.* at 820.

¶ 44    Finally, *Peile* cited *Oak Park Federal Saving & Loan Ass'n*. There, the plaintiffs instituted a suit for declaratory judgment against the defendant, the Village of Oak Park, seeking to declare invalid several ordinances purportedly adopted pursuant to its home-rule powers under the second provision of section 6(*l*)[4] of article VII of the Illinois Constitution of 1970. *Oak Park Federal Savings & Loan Ass'n*, 54 Ill. 2d at 201. One ordinance "defined the procedures for establishing areas for the providing of special services and provided that the president and board of trustees of the Village of Oak Park shall be the governing body of the special service area." *Id.* at 202. That ordinance also "authorized the levying of taxes by the village board on the property in the special service area and the issuance of bonds to be retired by taxes levied against the property included in the area." *Id.* Yet another ordinance "provided for the issuance of bonds of the special service area in the amount of $1,550,000 to be retired by the levy of taxes on the property within the district." *Id.* As to all the ordinances, the plaintiffs asserted that the defendant could not, "without enabling legislation adopted by the General Assembly, create a special service area or impose taxes or issue bonds to

---

[4]Section 6(*l*) provides:

"The General Assembly may not deny or limit the power of home rule units (1) to make local improvements by special assessment and to exercise this power jointly with other counties and municipalities, and other classes of units of local government having that power on the effective date of this Constitution unless that power is subsequently denied by law to any such other units of local government or (2) to levy or impose additional taxes upon areas within their boundaries in the manner provided by law for the provision of special services to those areas and for the payment of debt incurred in order to provide those special services." Ill. Const. 1970, art. VII, § 6(l).

provide special services under section 6(*l*)." *Id.* at 203. This court agreed, explaining that

> "[a]lthough the first part of section 6(*l*) appears to command that the General Assembly not interfere with the home-rule power specified in this subsection, paragraph (2) of subsection (*l*) seems to require that the power be exercised only pursuant to a law adopted by the General Assembly. If we hold that the provisions of section 6(*l*)(2) are self-executing and that a home-rule unit may enact ordinances creating special service areas and imposing taxes to provide special services without enabling legislation, then no effect is given to the words 'in the manner provided by law' and such a construction will render these words meaningless." *Id.* at 203-04.

Thus, *Village of Oak Park* equated the phrase "in the manner provided by law" in section 6(*l*) with "specific enabling legislation." *Id.* at 204. The foregoing review of the above cases simply demonstrates the general bounds of the legislature's constitutional lawmaking mandate and permissible delegation or implementation thereof.

¶ 45      As plaintiffs correctly observe, the County and the appellate court's position narrowly focuses upon the legal authority for *spending* transportation tax revenue as opposed to that for collecting such revenue. On this point, we would be remiss to ignore the fact that the Amendment does not exclusively deal with money derived from taxes. It also encompasses money sourced from "bond proceeds, *** fees, [and] excises." Ill. Const. 1970, art. IX, § 11(a). Numerous "laws," for example, govern local governments' issuance of bonds. See, *e.g.*, *id.* art. VII, § 7 (providing in part that "[c]ounties and municipalities which are not home rule units shall have only power granted to them by law *and the power[ ] *** (5) to incur debt except as limited by law* and except that debt payable from ad valorem property tax receipts shall mature within 40 years from the time it is incurred" (emphases added)); *id.* § 6(a) (home-rule units have the power "to incur debt"); see *id.* § 6(j) (providing in part that "[t]he General Assembly may limit by law the amount of debt which home rule counties may incur"); 30 ILCS 345/5(a) (West 2016) (providing that "[n]o unit of local government shall issue any private activity bond, except in conformity with rules established by the Governor's office pursuant to this [Illinois Private Activity Bond Allocation] Act"). The County's interpretation does not attempt to reconcile

how these other revenue-generating vehicles may additionally speak to the meaning of the phrase "as authorized by law."

¶ 46   It is the Amendment itself that decides what certain proceeds must be spent on. The Amendment's use of the phrase "as authorized by law" in the second sentence of subsection (b) does not swallow the rest of that provision. It grants the legislature the ability to define *additional* categories of transportation purposes. Stated differently, though units of local government vary in their respective powers or abilities to generate money from bonds, taxes, fees, excises, or license taxes, the legislature may broaden or limit the reach of such powers or abilities. However, if the money generated therefrom relates to transportation, then the Amendment— and not the legislature—decides how that money is spent.

¶ 47   As mentioned, the County's position is that the Amendment leaves it up to the legislature to statutorily direct whether money derived from transportation-related taxes imposed by home-rule units is to be spent on transportation-related purposes. The problem with the County's interpretation is that, if a statute does not direct how money is to be spent at the local government level, then the legislature could block the local reach of the Amendment by making sure such money never falls into the transportation fund "pot" to begin with. See Ill. Const. 1970, art. IX, § 11(d) (stating that "[n]one of the revenues described in subsection (a) of this Section shall, by transfer, offset, or otherwise, be *diverted* to any purpose other than those described in subsections (b) and (c) of this Section" (emphasis added)); see also Webster's Third New International Dictionary 663 (10th ed. 2014) (defining "divert" as "to turn from one course, direction, objective, or use to another"). If such money is never in the transportation pot to begin with, the legislature would technically never have to divert anything. The legislature could choose to not statutorily direct how home-rule units' transportation funds are to be spent or could attempt to statutorily earmark such funds for nontransportation purposes. Such a result would contradict the entire point of the Amendment, which was to prevent legislative sweeps of earmarked funds to non-transportation-related purposes. See generally *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611; see also *id.* ¶ 45 (holding that the legislature is free to enact legislation permitting it to sweep funds to other purposes). At bottom, the Amendment takes away the legislature's essentially unbridled discretion to determine *how* transportation-related funds are spent. Subsection (a) says it loud and clear—"[n]o moneys" from transportation-related

- 22 -

taxes are to be spent on anything other than transportation-related purposes. See Ill. Const. 1970, art. IX, § 11(a).

¶ 48 The County's argument also presents the potential issue of whether the legislature *could* statutorily direct (and thus preempt) how home-rule units spend money from their transportation-related taxes. Following the Amendment, the legislature no longer has the discretion to decide whether such funds can be spent on nontransportation purposes. Section 6(i) of article VII, which provides for statutory preemption of home-rule powers, presupposes that both the legislature and home-rule unit have concurrent authority as to the power at issue. See Ill. Const. 1970, art. VII, § 6(i) ("Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit *the concurrent exercise* or specifically declare the State's exercise to be exclusive." (Emphasis added.)); see also Webster's Third New International Dictionary 472 (10th ed. 2014) (defining "concurrent" as "joint and equal in authority"); *id.* at 1778 (defining "power" as "capability of acting or of producing an effect"). If the legislature thus could not statutorily preempt home-rule units' spending of transportation-related funds, then the terms "local government" and "as authorized by law" would possibly be rendered meaningless under the County's position. See *Rushton v. Department of Corrections*, 2019 IL 124552, ¶ 14. Accordingly, for all of the reasons stated above, the County's arguments pertaining to subsections (b) and (c) fall short.

¶ 49 Next, the County directs our attention to subsection (e), which it maintains prevents any future use of transportation revenues by anyone who may in the future wish to use those revenues for "modes of transportation" not discussed in the Amendment. See Ill. Const. 1970, art. IX, § 11(e) (providing that, "[i]f the General Assembly appropriates funds for a mode of transportation not described in this Section, the General Assembly must provide for a dedicated source of funding"). According to the County, if the Amendment's framers had wanted to include home-rule transportation funds within the Amendment's scope, it would have also referred to future *local* legislators in subsection (e). See also 2021 IL App (1st) 190396, ¶ 108 (questioning why the Amendment would "lock down the General Assembly but give home-rule units a pass" where home-rule units are "just as capable of 'appropriat[ing] funds' for some new mode of transportation and equally able to 'provide for a dedicated source of funding' ").

¶ 50    First, and contrary to the appellate court's speculative inquiry, it is irrelevant *why* home-rule units are not included in this subsection. It is the absence of mention that shows that subsection (e) only applies to the legislature. The omission of "local governments" from subsection (e) does not impliedly constrain the breadth of subsection (a), which again focuses on the "money," not the governmental entity. Subsection (e) deals with the very narrow situation of financing future modes of transportation. Furthermore, as observed by plaintiffs, if it were the drafters' intent to exempt home-rule expenditures from the scope of the Amendment, it is far more likely that the drafters would have done so in an explicit manner similar to that of subsection (f) rather than by implication. See Ill. Const. 1970, art. IX, § 11(f) (providing that "[f]ederal funds may be spent for any purposes authorized by federal law").

¶ 51    Finally, the County argues that plaintiffs' interpretation would mean that the Amendment could "radically diminish" the constitution's home-rule article without ever mentioning home-rule authority. The County asserts that a fundamental power and function pertaining to the government and affairs of a home-rule unit is deciding how to spend its money. See *Pechous v. Slawko*, 64 Ill. 2d 576, 591 (1976); *Independent Voters of Illinois Independent Precinct Organization v. Ahmad*, 2014 IL App (1st) 123629, ¶ 54; *Rajterowski v. City of Sycamore*, 405 Ill. App. 3d 1086, 1115 (2010). According to the County, the drafters should have amended section 6 of article VII if it intended for the Amendment to encompass funds generated from home-rule unit transportation-related taxes or specifically stated in the Amendment that it was preempting the home-rule power to spend revenue—as would be required if a statute was preempting that power. See Ill. Const. 1970, art. VII, § 6(i); 5 ILCS 70/7 (West 2018).

¶ 52    We find that the import of these cases is not as simple of a proposition as urged by the County, *i.e.*, that "a fundamental power and function pertaining to the government and affairs of a home rule unit is deciding how to spend its money." All three cases show that this "power" is not as unfettered and absolute as the County suggests. See *Pechous*, 64 Ill. 2d at 591 (holding that it was permissible for an ordinance to fix the salaries of home-rule unit officers because it concerned the municipality's government and affairs *and because it did not fall within one of the exceptions of section 6(f)*); *Ahmad*, 2014 IL App (1st) 123629, ¶¶ 1, 25, 54 (finding that the plaintiff taxpayers failed to plead facts to defeat the deference afforded to

the legislative findings contained in an ordinance that a concession agreement between the City of Chicago and Chicago Parking Meters was " 'in the best interests of the residents of the City [of Chicago] and desirable for the welfare of its government' " (quoting Chicago City Council, Journal of Council Proceedings, Dec. 4, 2008, at 50,508)); *Rajterowski*, 405 Ill. App. 3d at 1090, 1114-16 (concluding that the plaintiffs failed to state a claim that the City of Sycamore circumvented the School Code (105 ILCS 5/1-1 *et seq.* (West 2008)) via an ordinance that raised tax revenues without following the proper procedures set forth in the School Code because the plaintiffs did not point to a provision that specifically restricted a municipality's power to forward monies to school districts); see also *Rajterowski*, 405 Ill. App. 3d at 1092 (noting that home-rule municipalities "may exercise their taxation powers, *unless restricted by the constitution or appropriate legislation*" (emphasis added) (citing *Mulligan v. Dunne*, 61 Ill. 2d 544, 550 (1975))).

¶ 53        Plaintiffs correctly observe that home-rule units are always subject to *constitutional* limits on governmental power. Under the County's logic, other constitutional provisions would be called into question because they do not explicitly state that they govern home-rule units. See Ill. Const. 1970, art. IX, § 2 (uniformity clause); *id.* art. XIII, § 5 (pension protection clause); *id.* art. X, § 3 (providing in part that "[n]either the General Assembly nor any county, city, town, township, school district, or other public corporation, shall ever make any appropriation or pay from any public fund whatever, anything in aid of any church or sectarian purpose"). The County does not argue that these provisions do not apply to home-rule units and cites no legal authority to support its argument. We entertain it no further.

¶ 54        In a similar vein, the County next explains that it "is not asserting that, as a general matter, a given constitutional provision could not restrict another constitutional provision" but that section 6(a) of article VII "should only be alterable by more than implication." We reject the County's characterization that section 6(a) has been "altered" or that the Amendment limits home-rule units' power by "implication." The Amendment plainly applies to home-rule units' revenues generated from transportation-related taxes. Again, the County cites no legal authority in support of this argument.

¶ 55      For the foregoing reasons, we find the language of the Amendment to be plain and unambiguous, reject the County's interpretation of the Amendment as unreasonable, and find no issue with the manner in which home-rule units have had their power limited in the transportation context. However, we move on to dispense with one final argument.

¶ 56                          III. Extrinsic Sources

¶ 57      The County asserts that, "to the extent the amendment could be interpreted as plaintiffs suggest, it is ambiguous, and the extrinsic evidence uniformly supports the County and the lower courts' interpretation." This argument assumes that the County's interpretation is also reasonable. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010) (explaining that "*if* a [provision] is capable of being understood by reasonably well-informed persons in two or more different ways, the statute will be deemed ambiguous" (emphasis added)); see also *People v. Rinehart*, 2012 IL 111719, ¶ 26 (stating that "[i]f a statute's language is unclear or ambiguous, if it is susceptible of more than one reasonable reading, we must resort to other sources to aid our inquiry" (citing *People ex rel. Department of Professional Regulation v. Manos*, 202 Ill. 2d 563, 571 (2002))). As we have explained, the County's interpretation of the Amendment is unreasonable.

¶ 58      If the Amendment is plain such that there is no ambiguity, then we have no reason to consider extrinsic aids. *Neiberger v. McCullough*, 253 Ill. 312, 323 (1912) (stating that, where "the language of the constitution is not ambiguous it is not permissible to interpret it differently from its plain meaning"); see also *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184 (1999) (explaining that "[t]he primary rule of statutory construction is to give effect to legislative intent by *first* looking at the plain meaning of the language" (emphasis added)). However, the County has every motive to argue that the Amendment is ambiguous to direct our attention to several items of extrinsic evidence.[5] See 2021 IL App (1st) 190396, ¶¶ 127-60 (examining the legislative debates, the Secretary of State's published explanations of the Amendment that were sent to Illinois voters (ballot summary) (see Ill. Const. 1970, art. XIV, § 2(b)), and the Transportation Funding Protection

---

[5]Interestingly, and unlike in its briefs, at oral argument the County almost exclusively focused upon its contention that the Amendment is ambiguous.

- 26 -

Act (see Pub. Act 101-32 (eff. June 28, 2019) (adding 30 ILCS 178/5-10))). For example, the County stresses, among other things, that the sponsors of Joint Resolution Constitutional Amendment 36 in both houses agreed that the language of the Amendment was ambiguous and that a "sponsor asserted that the Amendment was *not* intended to apply to home-rule taxes." (Emphasis added.) We make clear that extrinsic sources do not trump the plain meaning of a provision.

¶ 59        Furthermore, we do not defer to the legislative branch for its opinion as to whether certain language is plain or ambiguous. See *Allegis Realty Investors v. Novak*, 223 Ill. 2d 318, 334 (2006) (stating that "each of the three branches of government retains its own sphere of authority, free from undue encroachment by the other branches"). The plain language of a provision "remains the best indication" of intent. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 14. The County attempted to create ambiguity by discussing these extrinsic sources at the outset of its brief.[6] However, "[w]here the language is clear and unambiguous, we must apply the [provision] *without resort to further aids of statutory construction*." (Emphasis added.) *Andrews v. Kowa Printing Corp.*, 217 Ill. 2d 101, 106 (2005).

¶ 60        Finally, we reject the County's argument that, if we agree with plaintiffs' interpretation of the Amendment, this means that the Amendment must be voided because voter confusion contributed to its passage. Unsurprisingly, the County cites the published explanation of the Amendment that was sent to voters. For the reasons we have just explained, we will not consider that extrinsic source. Accordingly, because the Amendment, by its plain language, applies to all moneys derived from transportation-related taxes, fees, excises, or license taxes, we hold that the circuit court erroneously dismissed plaintiffs' complaint.

¶ 61                                    CONCLUSION

¶ 62        Because plaintiffs have associational standing and the moneys derived from the Cook County Transportation Taxes are subject to the Amendment, we reverse the

_____

[6]We also squarely reject the County's improper attempt to influence our decision by arguing that our holding will require an increase in Cook County taxes. See *Jorgensen v. Blagojevich*, 211 Ill. 2d 286, 316 (2004) (stating that "[n]o principle of law permits us to suspend constitutional requirements for economic reasons").

- 27 -

circuit court's dismissal of the complaint. The case is thus remanded to the circuit court for further proceedings consistent with this court's opinion.

¶ 63    Appellate court judgment affirmed in part and reversed in part.

¶ 64    Circuit court judgment reversed.

¶ 65    Cause remanded.

¶ 66    JUSTICE THEIS, dissenting:

¶ 67    Article VII, section 6(a), of the Illinois Constitution of 1970 confers broad powers upon a home rule unit, including the power to tax and spend. See Ill. Const. 1970, art. VII, § 6(a). Article IX, section 11, commonly known as the safe roads amendment, constitutes a severe curtailment of a government's ability to allocate revenues. See Ill. Const. 1970, art. IX, § 11. These provisions conflict, and "[w]hen different parts of the constitution appear to conflict, it is our duty to harmonize them, if practicable." *Blanchard v. Berrios*, 2016 IL 120315, ¶ 23. The majority makes no attempt to harmonize article VII, section 6(a), with article IX, section 11. Instead, with virtually no analysis of the conflict, it allows the latter section to trump the former with respect to revenues derived from several of Cook County's tax ordinances. But see *id.* ("One provision will not be allowed to defeat another if a reasonable construction will permit them to stand together."). Consistent with our duty to harmonize these conflicting sections, the proper conclusion is that the safe roads amendment applies exclusively to state-imposed tax revenues, not revenues imposed under a home rule unit's authority. Accordingly, I respectfully dissent.

¶ 68    As this court has observed, "[t]he concept of home rule adopted under the provisions of the 1970 constitution was designed to drastically alter the relationship which previously existed between local and State government." (Internal quotation marks omitted.) *City of Rockford v. Gill*, 75 Ill. 2d 334, 339 (1979). The home rule provisions delegated greater autonomy to home rule units in determining their government and affairs. *Id.* at 339-40. "Home rule is based on the assumption that municipalities should be allowed to address problems with solutions tailored to

their local needs." *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 29.

¶ 69　　　Section 6(a) of article VII of the Illinois Constitution provides:

"Except as limited *by this Section*, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." (Emphasis added.) Ill. Const. 1970, art. VII, § 6(a).

This provision "was written with the intention that home rule units be given the broadest powers possible." *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 174 (1992); see also Ill. Const. 1970, art. VII, § 6(m) ("Powers and functions of home rule units shall be construed liberally."). This court has repeatedly upheld a home rule entity's appropriation of funds under its constitutional home rule spending authority. See *Allen v. County of Cook*, 65 Ill. 2d 281, 288 (1976); *Pechous v. Slawko*, 64 Ill. 2d 576, 591 (1976).

¶ 70　　　In November 2016—nearly 50 years after the home rule provisions were incorporated into this state's constitution—Illinois voters approved the safe roads amendment. Section 11(a) of the amendment, which the majority insists is the determinative provision, reads:

"No moneys, including bond proceeds, derived from taxes, fees, excises, or license taxes relating to registration, title, or operation or use of vehicles, or related to the use of highways, roads, streets, bridges, mass transit, intercity passenger rail, ports, airports, or to fuels used for propelling vehicles, or derived from taxes, fees, excises, or license taxes relating to any other transportation infrastructure or transportation operation, shall be expended for purposes other than as provided in subsections (b) and (c)." Ill. Const. 1970, art. IX, § 11(a).

¶ 71　　　When this court construes a constitutional provision, "our primary purpose is to effectuate the common understanding of the persons who adopted it—the citizens of this state." (Internal quotation marks omitted.) *Hooker v. Illinois State Board of Elections*, 2016 IL 121077, ¶ 35; see also *Kanerva v. Weems*, 2014 IL 115811, ¶ 36 ("The construction of constitutional provisions is governed by the same general

- 29 -

principles that apply to statutes."). To determine their understanding, we "consider the language used, the object to be attained, or the evil to be remedied." (Internal quotation marks omitted.) *Rock v. Thompson*, 85 Ill. 2d 410, 427 (1981). "This may involve more than the literal meaning of the words." *Id.*; see also *In re Julie M.*, 2021 IL 125768, ¶ 27 (observing that this court will not construe words and phrases in isolation but in light of other relevant provisions); *Van Dyke v. White*, 2019 IL 121452, ¶ 46 (same); *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006) ("[W]e are not bound by the literal language *** if that language produces absurd or unjust results not contemplated by the legislature.").

¶ 72     The safe roads amendment must be construed together with the home rule provisions that preceded it by nearly five decades. See *Blanchard*, 2016 IL 120315, ¶ 23. The majority's reading of the amendment severely limits a home rule unit's authority to appropriate funds, in conflict with article VII, section 6(a). It does so, even though the plain language of article VII, section 6(a), confirms that home rule powers can only be limited by that section. See Ill. Const. 1970, art. VII, § 6(a); *People ex rel. Bernardi v. City of Highland Park*, 121 Ill. 2d 1, 12 (1988) ("Other provisions of section 6 establish procedures *** by which the General Assembly can preempt home rule authority in matters pertaining to local government and affairs ***."); *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 503 (1984) (observing that "sections 6(g) and 6(h) of that article (Ill. Const. 1970, art. VII, secs. 6(g), (h)) *** provide the exclusive methods by which the legislature may preempt a home rule power").

¶ 73     Thus, article IX, section 11, is ambiguous. "If doubt as to the meaning of a provision exists after the language has been considered, it is appropriate to consult" extrinsic aids, including "the drafting history of the provision, including the debates of the delegates to the constitutional convention." *Blanchard*, 2016 IL 120315, ¶ 16.

¶ 74     Our objective in construing a constitutional provision "is to determine and effectuate the common understanding of the citizens who adopted it." *Kanerva*, 2014 IL 115811, ¶ 36. Accordingly, we must review the explanation provided to the citizens when they were voting on the safe roads amendment. See Ill. Const. 1970, art. XIV, § 2(b) ("Amendments proposed by the General Assembly shall be

published with explanations, as provided by law, at least one month preceding the vote thereon by the electors.”).

¶ 75     In relevant part, the ballot summary read:

“This new Section is a limitation on the power of the General Assembly or a unit of local government to use, divert, or transfer transportation funds for a purpose other than transportation. It does *not*, *and is not intended to*, impact or change the way in which the State and local governments use sales taxes, including the sales and excise tax on motor fuel, or *alter home rule powers* granted under this Constitution.” (Emphases added.)

As this passage shows, there is no doubt that voters approved of the safe roads amendment with the understanding that it would not alter the operation of home rule powers. Again, the purpose of our inquiry is to understand the voters’ intent in adopting this amendment. The answer to that critical question is that voters knew that the adoption of the safe roads amendment would not change their local government’s constitutional authority to address problems with solutions tailored to their local needs.

¶ 76     The legislative debates confirm that members of the General Assembly also did not intend for this amendment to limit the home rule unit’s spending power as the majority concludes. The following exchange between Senators Raoul and Hanie illustrates that intent.

“SENATOR RAOUL: As mentioned, this—this language is very ambiguous to me, so I just want to ask these questions. Senator Haine, Cook County imposes several taxes that provide revenue for public safety operations, including, but not limited to, the criminal court system, the Cook County Jail, Cook County Sheriff, the Cook County State’s Attorney, the Office of the Chief Judge of Cook County. *These taxes are imposed by virtue of Cook County’s home-rule taxing authority under the Illinois Constitution.* Specifically, Cook County imposes the Wheel Tax, New Motor Vehicle Tax, Motor Fuel Taxes, the Use Tax, the Non-Retailer Vehicle Transaction Tax, and the Non-Retailer Use Tax. Again, revenues from these taxes are used to pay for Cook County’s public safety operations, including workers’ compensation claims for affected public safety employees. *Am I correct that under this constitutional*

- 31 -

*amendment, Cook County could continue to spend the monies—from these taxes on its public safety operations*?

\* \* \*

SENATOR HAINE: *The answer is yes* for four reasons. First, as I explained earlier, this proposed constitutional amendment is intended to be on par with Article VI[I], Section 6 of the Constitution and current home-rule power. *The proposed constitutional amendment is not intended to eliminate, restrict, or apply to current constitutional and statutory authority that home-rule units have—have relative to taxes, spending, and public safety functions.* Secondly, since the Cook County's Use Tax and Non-Retailer Use Tax are general taxes on all tangible personal property just like the State sales tax, those taxes are not covered by this constitutional amendment, as I've explained earlier. Thirdly, as I stated earlier, it is a valid transportation purpose to spend monies under this amendment on the enforcement of traffic, railroad, and motor carrier laws. As a result, Cook County can continue to spend monies from these taxes on these public safety operations at—as it is today.

\* \* \*

Finally, I draw to your attention page 2, lines 13-14 of the constitutional amendment. Here the amendment provides that transportation funds may be expended 'with respect to local government, other transportation purposes as authorized by law'. The key phrase is 'authorized by law'.

\* \* \*

This phrase, 'as authorized by law', includes local governments' current use as authorized by current law—for instance, critical public safety functions as police departments, jail operations, and courts. *This provision is intended to be construed broadly so as not to interfere in any way with local governments' current authority and practices.* The language permits the General Assembly to determine, with respect to local governments, what are other proper transportation purposes by statute. It is also permitting home-rule units to determine what are other proper transportation purposes as well by virtue of their home-rule taxing power under Article VII, Section 6 of the Constitution.

Given that Cook County and the City of Chicago as well as other home-rule units have the home-rule power to impose taxes that you listed, the language provides a further basis allowing the home-rule units to spend these monies on public safety." (Emphases added.) 99th Ill. Gen. Assem., Senate Proceedings, May 5, 2016, at 67-70 (statements of Senators Raoul and Haine).

¶ 77    The majority closes its eyes to this evidence, asserting that the language of the safe roads amendment is unambiguous and thus the clear understanding of the voters and the General Assembly must be ignored. Yet, article IX, section 11, is ambiguous because its plain language does not state that it is a limitation on article VII, section 6(a)—indeed, it does not mention article VII, section 6(a), at all. This ambiguity compels us to consider the relevant extrinsic sources. And once we do, it is clear that the neither the General Assembly nor the voters intended for the amendment to limit Cook County's ability to spend funds from the challenged tax ordinances.

¶ 78    In sum, the majority's construction fails to effectuate both the citizen's understanding of the safe roads amendment and the legislature's intent in supporting it, thereby undermining the will of the people. Therefore, I respectfully dissent.