**Harold ADLER**

v.

**MICROWAVE COMMUNICATIONS, INC., et al.**

**Civ. A. No. 70–304.**

United States District Court, D. Massachusetts.

Jan. 24, 1973

Robert M. Buchanan, Robert B. Luick, Sullivan & Worcester, Boston, Mass., for plaintiffs.

J. Joseph Maloney, Daniel D. Gallagher, Maloney, Gallagher & Kirk, Boston, Mass., for Microwave Communications, Inc. and John D. Goeken.

James J. Myers, Gadsby & Hannah, Boston, Mass., for Thomas J. Hermes.

## OPINION

CAFFREY, Chief Judge.

This is a civil action in which the jurisdiction of this court is invoked both on the basis of diversity jurisdiction, 28 U.S.C. § 1331, and on the basis of the so-called federal question jurisiction under the Securities Act of 1933, 15 U.S.C. 77a–77aa, and also under the Securities Act of 1934, 15 U.S.C. 78a–78ii. Plaintiff seeks injunctive relief in the nature of an order that defendant Microwave Communications, Inc. (hereinafter MCI) issue 240 shares of common stock to him upon his payment to MCI of $30,000 or, alternatively, pay him money damages. A demand for jury trial was waived by the parties and the case was tried to the court.

Plaintiff, Harold Adler, is a citizen of Massachusetts. Defendant MCI is an Illinois corporation. Defendant John D. Goeken is a citizen of Illinois and President of MCI. Defendant Thomas J. Hermes is a citizen of Illinois and Secretary-Treasurer of MCI. After trial, the parties filed requests for findings and rulings and memoranda of law in support thereof. I find and rule as follows:

MCI was incorporated under the laws of the State of Illinois in 1963 and has its principal place of business in Joliet, Illinois. In December 1963, MCI applied to the Federal Communications Commission (hereinafter FCC for permits allowing construction and operation by it of a microwave communications system between Chicago and St. Louis. A hearing on the application was held by an FCC hearing examiner between February 13 and April 19, 1967, during which one of the issues was MCI's financial qualification to carry out its proposal. On October 17, 1967, the hearing examiner issued an initial decision granting the construction permits sought by MCI, and on August 14, 1969 the FCC affirmed the hearing examiner's ruling and granted MCI's application.

Starting in late 1966, MCI had a continuing plan to meet its short term and long range financial needs, which included selling common stock or rights to purchase common stock, contingent upon FCC approval of the MCI application. In late 1966 or early 1967, plaintiff Adler was contacted on behalf of MCI by a person named Brad Welch who telephoned Adler from New York, describing himself as a consultant for MCI in MCI's efforts to obtain financing. Subsequently, in January 1967, Adler was visted at his home in Lincoln, Massachusetts, by the defendant John D. Goeken who requested Adler to buy stock in MCI. Goeken advised Adler of the importance to MCI of being able to satisfy the FCC examiner as to MCI's financial capability. Goeken predicted that if the permit were granted it would be the first time anyone had "beat the tele-

phone company and there were huge financial rewards."

Goeken visited Adler's home a second time, on which occasion Adler's counsel, Mr. Luick, was present. On this occasion Goeken furnished Adler with a document captioned "Resume of Corporate Background." Subsequent to the second meeting, Adler went to Chicago where he met with the Board of Directors of MCI on or about February 20, 1967. Present at this meeting were defendants Goeken and Hermes, Adler and three directors of MCI. This meeting consisted essentially of further discussion of whether or not Adler would invest in MIC. No decisions were arrived at at that meeting and the next meeting was held on February 28, 1967 at the law office of Sullivan & Worcester in Boston. Present at the February 28 meeting were Goeken, Hermes, Worthington, who was counsel for MCI and Adler and his counsel Luick and his accountant John Fisher. This meeting lasted five hours and was primarily concerned with the preparation of a *pro-forma* financial projection of what MCI would do if it were successful in getting the permit from the FCC. No agreement was reached at that meeting. During the course of this five-hour meeting Adler was called out of the room where he received a report from a Washington attorney to the effect that the probability of MCI's gaining the permit from the FCC then appeared "quite negative". Upon his return to the meeting Adler advised the representatives of MCI that on the strength of the intelligence report from Washington he was no longer interested in investing in MCI.

On March 1, Adler talked to Hermes by telephone and during the coversation Hermes suggested to Adler the possibility of Adler's investing in MCI through the medium of an escrow fund which, Hermes explained, would be a fund which could not be touched by the current creditors of the company but would be set up and represented to the FCC as available for use in construction by MCI if MCI obtained the permit. Hermes further stated that one of the basic terms of the escrow fund would be a provision that the fund would be left with an escrow agent until the FCC made a decision on the permit. If the decision was favorable to the MCI the escrow agent was then to turn the fund over to MCI for use in constructing microwave towers, etc. If the permit was denied, the escrow fund would be return to Adler. After some additional discussion Adler and Hermes settled on the figure of $30,000 for 240 shares. Adler testified that the figure of 240 shares was arrived at because there were only 2500 shares authorized and Hermes indicated to him that if he purchased anything in excess of 250 shares (10% of the outstanding shares) this would give the telephone company an opportunity to further delay the hearing and to demand a reopening thereof.

On March 7, Adler and Hermes participated in five or six telephone conversations and on that same day one telegram was sent by Hermes to Adler and two telegrams were sent by Adler to Hermes. In the course of the day Adler caused his broker, Paine, Webber, Jackson & Curtis, to transmit $30,000 to the State National Bank in Chicago which served as the escrow agent.

In the first telegram of March 7 (PX 2) Hermes stated "MCI confirms its offer of 240 shares for deposit of $30,000. to escrow account." In response Adler telegraphed a message (PX 3) to the effect that Luick would review the escrow agreement and that he was arranging transmittal of funds through his broker's Washington office. The third telegram (PX 4) was used by Adler to advise Hermes that Luick had determined the escrow agreement to be satisfactory. On March 10, 1967, the State National Bank wrote a letter to Adler (PX 5) acknowledging receipt of his $30,000 contribution to the escrow fund. The bank also sent Adler a copy of the escrow agreement. On March 14, Adler coun-

627

tersigned a copy of the bank's letter, thereby acknowledging his receipt of a copy of the escrow agreement and his agreement to be bound by its terms (PX 6).

Paragraph 7 of the escrow agreement provided that if no action were taken within twelve months of the date of the agreement itself, the escrow agent "shall return to depositors therein the funds which they had placed on deposit." Paragraph 6 of the escrow agreement provided that within thirty days after receipt by the escrow agent of an FCC order guaranteeing a construction permit to MCI, the escrow agent "shall deliver the funds on deposit to MCI," whereas paragraph 7 provided that if an FCC order denied all permits to MCI then the escrow agent "shall return the funds to the depositors."

The original escrow agreement was amended for the first time on February 15, 1968, to add an additional six months to the time within which FCC action was to occur on MCI's permit application. The escrow agreement was amended a second time by Adler's signature on August 16, 1968. This amendment added an additional six months to the period within which the FCC was to take action on the permit application.

On February 8, 1969, MCI sent Adler a new form of escrow agreement which, among other things, added MCI as a party thereto and changed the price per share to $300, as contrasted to the earlier agreement which placed the common stock price at $125.00 per share. This third amendment also contemplated extending the time within which the FCC could act to October 2, 1969. Adler declined to execute this proffered third amendment of the original escrow agreement and wrote a letter (PX 8) insisting on his right to receive 240 shares for $30,000. On March 6, 1969, the last day of the second extended period of the escrow agreement, the bank mailed Adler a check for $30,376.23.

Subsequently, the FCC did grant a permit to MCI to operate in the field of microwave communication and subsequent stock splits have established that the 240 shares for which Adler originally negotiated now due to the splits would constitute 19,200 shares of MCI. Other events show that these same shares would have produced a distribution to the owner of 24,000 Micron shares, which thereafter have been split to the point where they now amount to 120,000 shares of Micron. Adler, through his counsel, contends that the dollar value of the increased number of MCI and Micron shares is in the area of $1,000,000 plus.

In analyzing the transactions involved herein it is relevant to note that plaintiff Adler is not inexperienced or unsophisticated in either the field of electronics or investments. The record shows that he worked from 1941 to 1949 as a design engineer for Raytheon, that he had various administrative duties there, that he was chief draftsman for a time, had charge of various laboratories, and that he was concerned with a "fast-moving operation" during the war. He testified that in 1949 he started a company to do subcontracting in the military manufacturing field, with which he had become familiar while at Raytheon, and that he was employed by that company until it was acquired by Itek in 1956; that in 1956 he started another company to manufacture microfilm equipment and was President of that company; that he is an inventor who holds patents; and that both of the companies he founded utilized his patents, and that he sold the second company to ITT in 1966, after which he fulfilled a five-year contract with ITT. Adler testified that at present he had a laboratory in the basement of his home, with machine tools and test equipment, and that since 1966 he had been developing new products and has obtained new patents.

An examination of the escrow agreement and what I believe to be the credible evidence with reference thereto satisfies me that as an experienced inven-

tor, scientist and businessman, who had successfully formed, developed and sold two businesses since World War II, Mr. Adler understood the potential of MCI's successfully competing to obtain an FCC permit for microwave communication, and he realized that the outcome of a quest for a permit from a regulatory agency cannot be predicted with any greater degree of certainty than the outcome of a horse race, and for that reason he declined to make a straight risk-bearing investment in MCI.

I find that acting in consultation with his lawyers and accountants, Mr. Adler drove a shrewd "heads I win, tails I can't lose" type of bargain. Through the medium of the no-risk escrow agreement he entered into a transaction in which he was guaranteed to get a return of all his capital if MCI failed to obtain the FCC permit, and under which he would invest his funds in MCI only if it was guaranteed the opportunity to compete, which with his experience and sophistication he believed to be an opportunity reasonably sure to produce a tremendous financial return on his investment. That his evaluation was accurate, and that his business judgment was sound appears from the fact that he now seeks to recover herein on this aborted investment of $30,000, a sum in the approximate amount of One Million Dollars.

I further find that there is no credible evidence in this case that any false representation of material fact was made by defendant to Adler. I likewise find that no material facts were concealed from Adler. It should be noted that in so ruling I have in mind that the escrow agreement was not self-perpetuating and was executed to last only for the time period stated therein. When the second extension expired by its own terms, there no longer was in existence any contractual agreement or any other viable legal obligation between the parties. I rule that when Adler received back the $30,376.23 the defendants had satisfied all their legal obligations to him.

The plaintiff alleges that the transaction in question constituted an offer to sell the security, as defined in Section 2(1) of the Security Act of 1933, and that said transaction does not qualify as an exempt transaction under Section 4(2) of the Act.

It is not necessary for the court to determine whether or not Microwave has violated the Act through failure to file a registration statement as required by Section 5. Failure to fulfill the registration requirements would result in the appropriate case in civil liability under Section 12(1) of the Act. Winter v. D. J. & M. Investment and Construction Corp., 185 F.Supp. 943 (S.D.Cal.1960).

Section 12 limits plaintiff to an action at law or equity to recover the consideration paid for the security, with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

The remedy provided in Section 12 is the exclusive remedy for violation of the registration provision and is available only to an aggrieved purchaser and is expressly limited to rescission of the transaction if the purchaser still owns the security or damages if he has sold at a loss. It is thus the finding of the court that the remedy sought by the plaintiff for the alleged violation of Section 5 is not available in this case, and thus no claim upon which relief can be granted lies under the Securities Act of 1933.

Judgment for the defendants. Complaint dismissed.