2025 IL App (1st) 221581

No. 1-22-1581

Filed May 21, 2025

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| STEPHEN TWIGG, Individually and on Behalf of Himself and All Others Similarly Situated, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | 21 CH 2234 |
| ABBVIE INC., RICHARD A. GONZALEZ, and ROBERT A. MICHAEL, | ) ) ) ) | Honorable Anna H. Demacopoulos, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1        AbbVie Inc. (AbbVie) acquired the Irish pharmaceutical company Allergan plc (Allergan) in 2020. Allergan shareholders received cash and newly issued AbbVie shares in exchange for their shares in Allergan. Stephen Twigg, an Allergan shareholder, brought this action under section 12 of the Securities Act of 1933 (Securities Act) (15 U.S.C. § 77*l* (2018)), alleging AbbVie issued him unregistered shares in violation of the Securities Act. The circuit court found the AbbVie shares

issued to Allergan shareholders were exempt from registration and dismissed Twigg's amended complaint. Twigg appeals.[1]

¶ 2                                          I. BACKGROUND

¶ 3        AbbVie reached an agreement to acquire Allergan in June 2019. AbbVie agreed to pay $120.30 in cash and 0.866 of a newly issued AbbVie share in exchange for each outstanding Allergan share. In a written statement announcing the deal, AbbVie indicated it would rely on the exemption provided by section 3(a)(10) of the Securities Act (15 U.S.C. § 77c(a)(10) (2018)) from the requirement to file a registration statement with the Securities and Exchange Commission (SEC). Section 3(a)(10) exempts securities from registration when securities are issued in exchange for other securities and a court or governmental body finds the terms of the exchange fair after a hearing. *Id.* The companies aimed to complete the merger in "early 2020."

¶ 4        Irish law required court approval for AbbVie's acquisition of Allergan, which Irish law terms a "takeover." Allergan notified its shareholders on April 21, 2020, that the High Court in Dublin, Ireland, would consider the takeover in a hearing scheduled for May 6, 2020. Notices were published in an SEC filing, the *Wall Street Journal*, and the *Financial Times*. The notices stated, "[a]ny Interested Party may appear at the Hearing personally or be represented by a solicitor or by counsel." In accordance with the High Court's direction, the notices also requested any party intending to appear to notify Allergan's counsel in writing by May 1.

¶ 5        The hearing occurred before the High Court on May 6, resulting in approval of AbbVie's acquisition of Allergan. The High Court found, *inter alia*, (1) all interested parties had been duly notified of the hearing, (2) no party notified Allergan's counsel of an intent to appear nor did any party appear at the hearing, (3) over 99% of votes cast by Allergan shareholders were in favor of

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

the takeover, and (4) the "scheme [was] fair and equitable." *In re Allergan plc* [2020] IEHC 214, ¶ 41 (H. Ct. Ir.). The merger was completed two days later, on May 8. Consequently, Allergan shareholders received 0.866 of an AbbVie share (valued at $83.96 on that date) along with $120.30 in cash for each of their Allergan shares.[2] Since then, AbbVie shares have appreciated and are currently trading around $175.

¶ 6        Twigg brought this putative class action on behalf of all former Allergan shareholders who reside in the United States and received AbbVie shares in the 2020 merger. In addition, two AbbVie officers, Richard Gonzalez and Robert Michael, were named as defendants.[3] In an amended complaint,[4] Twigg asserted two claims. The first, brought under section 12(a)(1) of the Securities Act, alleged AbbVie failed to register the securities issued to Twigg and members of the putative class. The amended complaint asserted the registration exemption requirements of section 3(a)(10) were not satisfied and, therefore, the shares were not exempt. Specifically, travel restrictions implemented in response to the COVID-19 pandemic made it "effectively impossible" for Twigg or any other U.S. resident Allergan shareholder to appear at the hearing in Dublin, Ireland.

¶ 7        Twigg also alleged AbbVie misrepresented to the High Court that it had obtained all antitrust clearances required for it to acquire Allergan. The United States Federal Trade Commission (FTC) had only rendered a preliminary decision and order approving of a proposed consent agreement with the companies the day before the hearing, May 5, 2020. Among other terms, the proposed consent agreement called for Allergan to divest its interests in two drugs it was developing. The FTC's preliminary order provided 30 days for the companies to fulfill certain

---

[2]We take judicial notice of historical stock prices from Yahoo Finance. See *In re China Organic Securities Litigation*, No. 11 Civ. 8623, 2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013) (doing the same).

[3]We refer to AbbVie, Gonzalez, and Michael as "AbbVie," collectively, from here forward.

[4]The circuit court dismissed Twigg's initial complaint without prejudice upon granting AbbVie's motion to dismiss under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2022)).

actions, as well as an opportunity for the FTC to receive public comment. The order was subject to final approval, and the FTC retained the ability to modify or withdraw its approval. Final approval came in September 2020.

¶ 8          In addition, Twigg alleged AbbVie failed to inform the High Court of dissenting statements from two of the five FTC commissioners opposing approval of AbbVie's acquisition of Allergan. The dissenting commissioners' statements raised issues regarding potential effects on both competition in the pharmaceutical industry and on patients.

¶ 9          The second claim, pled against Gonzalez and Michael, alleged each officer was also liable for AbbVie's sale of unregistered securities. See 15 U.S.C. § 77o (2018) (providing for joint and several liability for "controlling persons" of any entity liable under section 12). Twigg demanded rescission and "constructively" tendered his AbbVie shares.

¶ 10          AbbVie filed a motion to dismiss the amended complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2020)). AbbVie asserted the shares were exempt from registration based on section 3(a)(10) of the Securities Act because the hearing before the High Court satisfied the exemption. While travel restrictions may have impaired the ability to attend in person, there was no restriction on the right to appear. In addition, Allergan shareholders could have appeared through Irish counsel. Further, AbbVie asserted the alleged misrepresentations and omissions were irrelevant, as section 3(a)(10) contains no requirement regarding what information must be presented at a fairness hearing. Alternatively, AbbVie argued that, because Twigg still owns the AbbVie shares, rescission is the only remedy available. If he were to return the shares, Twigg would receive less than their value. By contrast, Twigg could realize a profit simply by selling his shares.

¶ 11        Twigg replied that section 3(a)(10)'s exemption was not satisfied for both procedural and substantive reasons. As to procedure, he argued the travel restrictions associated with the COVID-19 pandemic meaningfully impaired the right to appear at the hearing before the High Court. Substantively, Twigg argued AbbVie misrepresented to the High Court that all antitrust clearances had been obtained when the FTC had only issued preliminary approval and AbbVie failed to disclose that two of the five FTC commissioners issued dissenting statements opposing the merger.

¶ 12        The circuit court issued a written order granting AbbVie's motion to dismiss. Initially, the court found the shares were exempt from registration based on the High Court hearing approving Allergan's takeover. Addressing Twigg's arguments, the court observed that the travel restrictions resulting from the COVID-19 pandemic pertained only to whether Twigg could personally attend the hearing, not whether he had a right to appear. The court noted Twigg could have retained counsel in Ireland to appear on his behalf, as he admitted at oral argument. Regarding Twigg's substantive arguments, the court reasoned such arguments were irrelevant to whether the section 3(a)(10) exemption applied. Instead, the court surmised, issues bearing on the information presented or omitted at a fairness hearing go to the propriety of the judgment rendered by the court that conducted the hearing and cannot be raised in a collateral proceeding. The court further observed that the dissenting FTC commissioners' statements addressed issues affecting consumers and competition in the marketplace and had no bearing on whether the acquisition was fair to Allergan shareholders. Finally, the court noted the only remedy available to Twigg was rescission because he still owned the AbbVie shares. In other words, he could not seek damages, only tender the shares to AbbVie and recoup the consideration he paid. But because the shares were trading higher, the court "question[ed] whether rescission would result in a detriment to Twigg and other class members." This appeal followed.

¶ 13                                          II. ANALYSIS

¶ 14                                        A. Section 2-619

¶ 15        Twigg appeals the circuit court's dismissal of his amended complaint pursuant to section 2-619 of the Code. Such a motion enables issues of law and easily proved issues of fact to be disposed of at the outset of litigation. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2003). Section 2-619(a)(9) permits involuntary dismissal where " 'the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Id.* (quoting 735 ILCS 5/2-619(a)(9) (West 1998)). An " ' "affirmative matter," in a section 2-619(a)(9) motion, is something in the nature of a defense which negates the cause of action completely.' " *Id.* (quoting *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994)). "[T]he 'affirmative matter' asserted by the defendant must be apparent on the face of the complaint; otherwise, the motion must be supported by affidavits or certain other evidentiary materials." *Id.* at 377.

¶ 16        The defendant has the initial burden of going forward on the motion. *Id.* Once a defendant satisfies its initial burden, the burden shifts to the plaintiff to demonstrate that the defense is "unfounded or requires the resolution of an essential element of material fact before it is proven." (Internal quotation marks omitted.) *Id.* If the court finds the plaintiff has failed to carry the shifted burden, the motion may be granted and the cause of action dismissed. *Id.*

¶ 17        We review an appeal from a section 2-619(a)(9) dismissal *de novo*. *Id.* Accordingly, we review only the trial court's judgment, not its reasoning, and we may affirm on any grounds in the record, regardless of whether the trial court relied on those grounds. *Colon v. Illinois Central R.R. Co.*, 2024 IL App (1st) 221841, ¶ 28. Ultimately, our review considers whether "the existence of a

genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law." (Internal quotation marks omitted.) *Van Meter*, 207 Ill. 2d at 377-78.

¶ 18                                    B. Registration of Securities

¶ 19        The purpose of the Securities Act is to protect investors by ensuring companies issuing securities make a " 'full and fair disclosure of information' " relevant to a public offering. *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 178 (2015) (quoting *Pinter v. Dahl*, 486 U.S. 622, 646 (1988)). "The linchpin of the [Securities] Act is its registration requirement." *Id.* Registration of securities promotes the Securities Act's intention "to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

¶ 20        Section 6 of the Securities Act (15 U.S.C. § 77f (2018)) provides the method for filing a registration statement with the SEC. A registration statement " 'includes the prospectus and other information required by section 7 of the Securities Act.' " *In re WorldCom, Inc. Securities Litigation*, 346 F. Supp. 2d 628, 657 (S.D.N.Y. 2004) (quoting 12 C.F.R. § 16.2(m) (1994)). "A prospectus is defined as an 'offering document that includes the information required by section 10(a) of the Securities Act.' " *Id.* (quoting 12 C.F.R. § 16.2(*l*) (1994)).

¶ 21        Section 5 of the Securities Act (15 U.S.C. § 77e(1) (2018)) makes it unlawful to sell securities not registered with the SEC. Section 12(a)(1) of the Securities Act enables a purchaser of unregistered securities to sue the seller in any court of competent jurisdiction to either (1) rescind the transaction and recoup the consideration paid upon tender of the securities or

(2) recover damages if the plaintiff no longer owns the security. *Id.* § 77*l*(a)(1). The purpose of this provision is to discourage the sale of securities without filing a section 6 registration statement. *American Bank & Trust Co. v. Barad Shaff Securities Corp.*, 335 F. Supp. 1276, 1280 (S.D.N.Y. 1972).

¶ 22      To state a claim under section 12(a)(1), a plaintiff must establish (1) the sale or offer to sell securities by the defendant, (2) the absence of a registration statement, and (3) use of the mails or the facilities of interstate commerce in connection with the sale or offer. *In re Laser Arms Corp. Securities Litigation*, 794 F. Supp. 475, 481 (S.D.N.Y. 1989). A showing of these three elements establishes a *prima facie* failure-to-register claim. *ABN AMRO, Inc. v. Capital International Ltd.*, 595 F. Supp. 2d 805, 833 (N.D. Ill. 2008).

¶ 23                                C. AbbVie's Claimed Exemption

¶ 24      AbbVie's section 2-619(a)(9) motion admits the legal sufficiency of Twigg's complaint. See *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31 (observing that a section 2-619(a)(9) motion admits the legal sufficiency of the complaint). In other words, AbbVie admits Twigg's amended complaint states a *prima facie* failure-to-register claim. However, AbbVie insists the shares issued to Twigg—and other Allergan shareholders—were exempt from registration. Exemption from registration is an affirmative defense to a failure-to-register claim. *ABN AMRO*, 595 F. Supp. 2d at 833. Affirmative defenses may be raised in a section 2-619(a)(9) motion. *Khan v. Fur Keeps Animal Rescue, Inc.*, 2021 IL App (1st) 182694, ¶ 33. Specifically, AbbVie contends the shares were exempted from registration by section 3(a)(10) of the Securities Act (15 U.S.C. § 77c(a)(10) (2018)).

¶ 25      In relevant part, section 3(a)(10) exempts from registration

"any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court." *Id.*

The section 3(a)(10) exemption "avoids the time and expense of registering shares and allows for the issuance of shares that are not restricted as they would have been if issued *** in a private placement." *Oceana Capitol Group Ltd. v. Red Giant Entertainment, Inc.*, 150 F. Supp. 3d 1219, 1223 (D. Nev. 2015). This exemption applies when a court has (1) found that the persons to receive shares held securities, claims, or property interests that were outstanding prior to the hearing; (2) conducted a fairness hearing at which all persons to whom the securities would be issued had the right to appear and be heard; and (3) found that the terms and conditions of the proposed exchange were fair. *Chapel Investments, Inc. v. Cherubim Interests, Inc.*, 177 F. Supp. 3d 981, 987 (N.D. Tex. 2016).

¶ 26        AbbVie attached a copy of the written order the High Court issued following the takeover hearing. *In re Allergan plc* [2020] IEHC 214. Among other things, the High Court found sufficient steps were taken to identify and notify all interested parties. The High Court also noted that Allergan shareholders voted overwhelmingly in favor of the "scheme of arrangement" for AbbVie's acquisition of Allergan. *Id*. ¶ 22. The order set forth in detail how the scheme satisfied all requirements under Irish law to determine whether to sanction a takeover scheme. Ultimately, the High Court concluded:

"The evidence establishes that there are good, sound and practical reasons for the objectives being sought by the scheme and that the scheme is fair and equitable. *** I have

no hesitation in concluding that the scheme is one in which an intelligent and honest person, being a member of the class voting at the meeting, acting in his or her own interests, might reasonably approve." *Id.* ¶ 41.

¶ 27    Because the exchange of newly issued AbbVie shares and cash for all outstanding Allergan shares was part of the "scheme," the High Court's approval constituted a finding that the terms and conditions of the exchange were fair. Consequently, AbbVie made a *prima facie* showing that the shares were exempt from registration pursuant to section 3(a)(10). AbbVie likewise satisfied its initial burden under section 2-619 of demonstrating an affirmative defense. The burden shifts, therefore, to Twigg to show AbbVie's defense is unfounded or requires the resolution of an essential element of material fact before it is proven. *Van Meter*, 207 Ill. 2d at 377.

¶ 28                                    D. Twigg's Arguments

¶ 29    Twigg argues the High Court hearing did not satisfy section 3(a)(10) and the exemption does not apply because (1) notice of the hearing was insufficient, (2) there was no meaningful right to appear, and (3) the companies failed to disclose the statements from the dissenting FTC commissioners at the hearing.[5]

¶ 30                                          1. Notice

¶ 31    Section 3(a)(10) is silent as to notice of a fairness hearing. However, the statute's requirement that all persons affected have the right to appear at the hearing necessarily implies a right to reasonable notice, as the lack of notice would render the right to appear practically meaningless. See 2B Norman J. Singer & Shambie Singer, Sutherland Statutory Construction § 55:3 (Nov. 2024 Update) ("A necessary implication within the meaning of the law is one that is

---

[5]In the trial court, Twigg alleged AbbVie misrepresented that it had obtained all required antitrust clearances. AbbVie disputed the point. Twigg's appellate brief does not argue this issue. Thus, we deem it forfeited. See Ill. S. Ct. R. 341(h) (eff. Oct. 1, 2020) (providing that points not argued in the appellant's brief are forfeited).

so strong in its probability that the contrary thereof cannot reasonably be supposed." (Internal quotation marks omitted.)); see also *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 441 (2010) ("[W]e presume that the legislature did not intend absurd, inconvenient, or unjust consequences."). Indeed, an SEC staff bulletin calls for adequate notice of the fairness hearing, which courts have cited approvingly. See SEC Staff Legal Bulletin No. 3A (CF), 2008 WL 6034958 (June 18, 2008); *In re Board of Directors of Multicanal, S.A.*, 340 B.R. 154, 168 (Bankr. S.D.N.Y. 2006); *Oceana Capitol Group*, 150 F. Supp. 3d at 1224.

¶ 32    Twigg contends the April 21, 2020, published notices were inadequate to provide reasonable notice to Allergan shareholders of the hearing set to occur only 15 days later, on May 6. The time frame was too short, he argues, as Allergan shareholders wishing to appear had to notify Allergan's counsel in writing of their intention by May 1. Even more of an obstacle, travel restrictions at the time due to the COVID-19 pandemic reduced the number of flights available, and a traveler to Ireland was required to quarantine for 14 days upon arrival.

¶ 33    We believe the notice provided was sufficient for purposes of section 3(a)(10). The High Court expressly found proper notice was given. Judicial comity militates toward deferring to the High Court's finding. See *Safety-Kleen Corp. v. Canadian Universal Insurance Co.*, 258 Ill. App. 3d 298, 306 (1994) ("Judicial comity is the principle whereby the courts of one jurisdiction may give effect to the laws and judicial decisions of another, not as a matter of obligation, but out of deference and respect."). In addition, the published notices indicate written notice to Allergan's counsel was directory, not a mandatory prerequisite to appear at the hearing. Further, while in-person attendance for a U.S.-based Allergan shareholder may have been impractical, the shareholders could have arranged for Irish counsel to appear on their behalf, as Twigg admitted in the trial court. Also significant, AbbVie and Allergan's June 2019 announcement stated they aimed

to complete the takeover in "early 2020." Thus, Allergan shareholders were apprised long before April 21, 2020, that a hearing was forthcoming. The notices only confirmed the specific date.

¶ 34                                    2. Right to Appear

¶ 35        Next, Twigg argues U.S.-based Allergan shareholders were deprived of a meaningful right to appear at the hearing. Like his notice argument, Twigg points to the practical impediments to in-person attendance at the hearing in Ireland. The possibility of appearing through Irish counsel as an alternative, he insists, was insufficient to satisfy the right to appear.

¶ 36        Despite the practical impediments to in-person attendance, we find Allergan shareholders had a right to appear at the May 6, 2020, hearing that satisfies section 3(a)(10). The statute does not specify that the right to appear includes the right to be physically present. And apart from certain proceedings where fundamental rights are at stake, such as in a criminal prosecution, in-person attendance is not required to satisfy due process. Meaningful alternatives were available. As admitted, shareholders could have appeared through Irish counsel. See Black's Law Dictionary 94 (7th ed. 1999) ("Appearance" means "[a] coming into court as a party or interested person, *or as a lawyer on behalf of a party or interested person*." (Emphasis added.)). In addition, evidence in the record indicates Irish courts were amenable to virtual appearance by telephone or videoconference. Twigg asserts that the High Court did not make videoconferencing available, but Twigg also failed to show it would not have permitted it if requested.

¶ 37                                    3. FTC Dissents

¶ 38        Lastly, Twigg asserts that failure to apprise the High Court of the dissenting FTC commissioners' statements was a material omission, essential to the fairness hearing, because a reasonably prudent investor might find the statements important. We reject his suggested standard as unworkable. It defies any limiting principle and fails to instruct a company seeking to use

section 3(a)(10)'s exemption on what must be disclosed to rely on the exemption. What a reasonably prudent investor could find "important" is only limited by imagination. This standard would render any fairness hearing insufficient and make section 3(a)(10) useless.

¶ 39          Section 3(a)(10) provides no express standard for determining fairness, nor does the statute state what information a court must consider. One court suggested the fairness hearing should amount to the functional equivalent of the full disclosure that would be provided in an appropriate prospectus and registration statement. *Securities & Exchange Comm'n v. Blinder Robinson & Co..*, 511 F. Supp. 799, 802 (D. Colo. 1981). That is, a fairness hearing should provide those to receive shares "a full and fair opportunity to learn everything required to make their decision" and "act in awareness of the risks involved. *** [N]othing more is required in the determination." *Id.*

¶ 40          Another court tasked with making a fairness determination observed, "a district court's role *** must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." (Internal quotation marks omitted.) *Oceana Capitol*, 150 F. Supp. 3d at 1224.

¶ 41          In *Multicanal*, the bankruptcy court stated, "the language and history of § 3(a)(10) [make] clear that Congress required more than procedural fairness and full disclosure when it mandated that there be a hearing upon the fairness of the transaction." *Multicanal*, 340 B.R. at 171. Therefore, a court must consider the value of the shares that will be issued compared to the securities, claims, or interest to be surrendered in the exchange. *Id.*

¶ 42          From any of these perspectives, the omitted information was not essential or relevant. The dissenting FTC commissioners' statements had no bearing on the value of the shares to be exchanged. Nor would this information be relevant to guard against fraud or collusion.

¶ 43    If viewing the fairness hearing as the functional equivalent of registration, the failure to disclose the dissenting FTC commissioners' statements—both their existence and content—would be material only if such information would be a required disclosure in a registration statement. Twigg has failed to demonstrate, however, any basis for us to conclude so. Nor is it apparent that a registration statement would require such disclosure. The information required in a registration statement is set forth in Securities Act Schedule A (15 U.S.C. § 77aa (2018)). Schedule A lists 32 items. The content of the dissenting statements addressed the merger's potential effects on competition in the pharmaceutical market and on the prices and availability of drugs for patients. Those issues do not appear within the scope of any of the 32 items of Schedule A. Thus, even if AbbVie had filed a registration statement, it may not have been required to include this information.

¶ 44    Also significant, the dissenting FTC commissioners' statements are public information posted on the FTC website. So regardless of whether this information was disclosed in the takeover hearing, the information was available to Allergan shareholders or any other investor. Likewise, the information was publicly available to investors regardless of whether AbbVie filed a registration statement.

¶ 45    For these reasons, we conclude the omission of the dissenting FTC commissioners' statements did not invalidate the section 3(a)(10) exemption.

¶ 46    Based on the foregoing, we find Twigg failed to carry his burden to show AbbVie's defense is unfounded or requires the resolution of an essential element of material fact before it is proven. Accordingly, dismissal of Twigg's amended complaint is warranted.

¶ 47                                E. Availability of a Remedy

¶ 48      Even if we had found dismissal improper on the prior issue, we would affirm dismissal based on AbbVie's alternative argument. In its section 2-619 motion and again on appeal, AbbVie argued Twigg's action should be dismissed for lack of an available remedy. The ability for a court to provide a remedy—that is, redressability—is an essential element of standing. *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (listing elements of standing, including that an injury be "redressable by a favorable ruling" (internal quotation marks omitted)). In Illinois, lack of standing is an affirmative defense, which the defendant has the burden to plead and prove. *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2022 IL 127126, ¶ 12. Lack of standing may be raised in a section 2-619(a)(9) motion as an affirmative matter that avoids the legal effect of or defeats the plaintiff's claim. *Davis v. Yenchko*, 2024 IL 129751, ¶ 15.

¶ 49      "Standing is a prudential doctrine that falls under the umbrella of justiciability." *Rowe v. Raoul*, 2023 IL 129248, ¶ 22. "The purpose of the doctrine of standing is to ensure that courts are deciding actual, specific controversies, and not abstract questions or moot issues." *In re Marriage of Rodriguez*, 131 Ill. 2d 273, 279-80 (1989). "In deciding whether a party has standing, a court must look at the party to see if he or she will be benefitted by the relief granted." *Id.*

¶ 50      A plaintiff has standing where there has been some injury in fact to a legally cognizable interest. *Illinois Road*, 2022 IL 127126, ¶ 13. "[T]he claimed injury, whether 'actual or threatened' [citation], must be: (1) 'distinct and palpable' [citation]; (2) 'fairly traceable' to the defendant's actions [citation]; and (3) substantially likely to be prevented or redressed by the grant of the requested relief [citations]." *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 492-93 (1988). Standing must be defined on a case-by-case basis (*People v. Greco*, 204 Ill. 2d 400, 409 (2003)) and determined from the allegations in the complaint, as of the date the lawsuit is filed. *Davis*, 2024 IL 129751, ¶ 13.

¶ 51    Here, Twigg has suffered no actual or threatened injury. On the contrary, he gained from AbbVie's actions. On the day of the merger, May 8, 2020, an Allergan share was valued at $193.02, a price affected positively by AbbVie's impending acquisition. In exchange for each Allergan share, Twigg received $120.30 and 0.866 of an AbbVie share, which was roughly equivalent to the $193.02 Allergan share price, because AbbVie shares closed trading on May 8, 2020, at $83.96.[6] When Twigg filed his initial complaint on May 6, 2021, AbbVie shares opened trading at a price of $115.00.[7] Thus, each of Twigg's AbbVie shares appreciated by about $30. This is a gain, not a loss.

¶ 52    Federal courts have dismissed section 12 claims in similar circumstances. *Merzin v. Provident Financial Group Inc.*, 311 F. Supp. 2d 674 (S.D. Ohio 2004); *Ong ex rel. Ong v. Sears, Roebuck & Co.*, No. 03 C 4142, 2005 WL 2284285 (N.D. Ill. Sept. 14, 2005); *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 1456047 (N.D. Cal. May 17, 2007). In each of these cases, the securities at issue had increased in value. Because the plaintiffs still owned the securities, the only remedy available under section 12 was rescission. See *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, 68 F. Supp. 3d 486, 496 (S.D.N.Y. 2014). ("Where a plaintiff still owns the security, its remedy is rescission."). The courts reasoned that, because rescission would result in a loss, the plaintiffs could not maintain a section 12 claim. See *Merzin*, 311 F. Supp. 2d at 684 ("Because in this case rescission would clearly result in a loss for Plaintiffs, such claim should be and is dismissed."); *Ong*, 2005 WL 2284285, at *16 (dismissing section 12 claim when "State Universities would still suffer a loss by tendering back its SRAC notes in exchange for the purchase price"); *Siemers*, 2007 WL 1456047, at *4 ("where, as here, the undisputed facts show that plaintiff has profited from the transactions at issue, such allegations

---

[6](83.96 x 0.866) + 120.30 = 193.01
[7]In April 2025, AbbVie shares were trading around $175.

cannot constitute a Section 12(a)(2) claim for damages. *** The same is true for securities currently held that could be sold at their present value for a profit.").

¶ 53    Like the plaintiffs in those cases, Twigg stands to lose money. If AbbVie were to return the cash value of Allergan shares in exchange for tendered AbbVie shares, it would result in a loss. Using the $193.02 Allergan share price from the merger date, which would be offset by the $120.30 Twigg received for each share, Twigg would receive $72.72 per share—approximately $100 less than the current value of AbbVie shares. It would be far more rational to simply sell the AbbVie shares. See *Pinter*, 486 U.S. at 637 n.13 ("[T]he purchaser of unregistered securities may keep his securities and reap his profit if the securities perform well during the year, but rescind the sale if they do not."). The financial reality here weighs heavily against finding standing: courts exist to redress or prevent injuries, not cause them.

¶ 54    Even so, rescission may not be possible. Although the section 12 remedy is described as rescission, the statute does not use that term. Instead, it provides for recovery of "the consideration paid." 15 U.S.C. § 77*l*(a) (2018). Consideration is "the money or property given by the investor in exchange for the security." *Randall v. Loftsgaarden*, 478 U.S. 647, 660 (1986). Twigg did not pay money in exchange for AbbVie shares: he gave shares in Allergan. Shares of a company acquired by merger cease to exist. *In re Broderbund/Learning Co. Securities Litigation*, 294 F.3d 1201, 1204 (9th Cir. 2002). So it is not possible to return what Twigg gave as consideration for AbbVie shares. See *Junker v. Crory*, 650 F.2d 1349, 1362 (5th Cir. 1981) (observing in a section 12 claim that rescission—"a complete return to the status quo ante"—was not possible when shares no longer existed due to a merger). Yet, as noted, even if he received the cash value instead, he would incur a loss. In any event, Twigg would not benefit from the relief granted. *In re Marriage of Rodriguez*, 131 Ill. 2d at 279-80.

¶ 55 Despite the lack of injury, Twigg insists his claim may proceed because other remedies, such as disgorgement or injunctive relief, are available. We disagree. Section 12's exclusive remedy for a plaintiff who still owns the securities is rescission. *Adler v. Microwave Communications, Inc.*, 353 F. Supp. 624, 628 (D. Mass. 1973); *Sweeney v. Keystone Provident Life Insurance Co.*, 578 F. Supp. 31, 33 (D. Mass. 1983) ("A plaintiff who still owns the security therefore has no choice: he can only get rescission and restitution, and his claim is contingent on tendering the security to defendant." (Emphasis omitted.)). Additional equitable relief may be available, but only to enforce the right to recover. *Sweeney*, 578 F. Supp. at 33. Thus, if Twigg cannot establish entitlement to rescission, he would not be entitled to any additional relief necessary to enforce it.

¶ 56 Ultimately, we find there is no injury substantially likely to be redressed by the requested relief in this case. Accordingly, Twigg's lack of standing is an independent basis for dismissal.

¶ 57 III. CONCLUSION

¶ 58 Based on the foregoing, we affirm the judgment of the circuit court.

¶ 59 Affirmed.

*Twigg v. AbbVie Inc.*, 2025 IL App (1st) 221581

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CH-2234; the Hon. Anna H. Demacopoulos, Judge, presiding. |
| **Attorneys for Appellant:** | J. Dominick Larry, of Nick Larry Law LLC, of Chicago, David W. Hall, of Hedin Hall LLP, of San Francisco, California, and Andrew J. Brown, of San Diego, California, for appellant. |
| **Attorneys for Appellee:** | Robert J. Kopecky, Joshua Z. Rabinovitz, Theresa Cederoth Horan, and Philip M. Cooper, of Kirkland & Ellis LLP, of Chicago, for appellees. |